Ruth Bender and Robert Bender, Appellants, v. William Cooper and Nephews, Inc., Appellee.

Gen. No. 42,310.

Opinion filed May 2, 1944.

I. B. LIPSON and A. C. LEWIS, both of Chicago, for appellants.

HAY, MORTON & FREYTAG and GARDNER, CARTON & DOUGLAS, all of Chicago, for appellee; ERWIN W. ROEMER, HERMAN T. VAN MELL and WILLIAM L. FAY, all of Chicago, of counsel.

MR. JUSTICE SCANLAN delivered the opinion of the court.

A suit for damages by Ruth Bender and Robert Bender, her husband, against defendant. Ruth Bender sued for personal injuries received by her, and Robert Bender sued for divers sums of money expended by him or for which he became liable by reason of the injuries sustained by his wife. At the close of plaintiffs' case the trial court, on motion of defendant, instructed the jury to find defendant not guilty. Plaintiffs appeal from a judgment entered on the verdict.

No point is raised on the pleadings. Defendant is a manufacturer of disinfectants and one of its products is called "Cooper's Pine Oil Disinfectant," which is sold in original sealed cans. While plaintiff Ruth Bender was pouring the liquid contained in a can of the disinfectant into a coffee can, some of the disinfectant splashed in her eye and she sustained the injuries for which she sues. Both parties, in their briefs, treat Ruth Bender as the plaintiff in the cause and we will do likewise.

Mrs. Bender is a well educated woman. Her father, a doctor, was associated in business with his brother, also a doctor. She testified that she was raised in a medical atmosphere. She and her husband lived on a farm in Warrenville, Illinois. She had thereon a dog

kennel, and a veterinary recommended defendant's disinfectant as a good disinfectant to use around kennels. She then commenced using Cooper's Pine Oil Disinfectant and, prior to the accident, she had been using it for about four years. During that period she had purchased a dozen or more gallon cans of the disinfectant. She bought it to use around the kennels. She testified that she did not use the Pine Oil in connection with her body; that she did not use it on the bodies of the dogs; that she used it to spread on the floors of the kennels and on the walls and beds of the kennels for the purpose of disinfecting and leaving a pleasant odor; that during the years that she had used the disinfectant she occasionally got some on her hands and that when this occurred she washed it off with water and that she had had no trouble with the disinfectant before the time in question. The material parts of the label upon the can read as follows:

"COOPER'S PINE OIL DISINFECTANT

"This is made according to the formula of the U. S. Government Hygienic Laboratory, and has a coefficiency of 3 when tested by the U. S. Department of Agriculture method. This means that COOPER'S PINE OIL DISINFECTANT is guaranteed to be 3 times stronger bactericidally than pure carbolic acid crystals when tested against a vigorous culture of Typhoid germs (Bacillus Typhosus) under conditions prescribed for this test.

"...

"For general use COOPER'S PINE OIL DISINFECTANT is very desirable—it is safe, non-irritating and of pleasing odor, whilst definitely recommended for use against Typhoid Fever germs (B. Typhosus). It is also effective against many other germs including Pneumococcus, Bac. Diphtheriae, Bac. Enterititis, Bac. Dysenteriae and Bac. Coli.

## ''For General Disinfecting and Cleaning

''As a deodorant use 2 ounces (½ cupful) in 3 gallons of water. If stronger odor is desired use more to suit conditions. For disinfecting use 6½ ounces in 3 gallons of water. Add the water to the disinfectant at rate of one gallon of Pine Oil Disinfectant to 60 gallons of water—put it in pail and stir well after adding water. This solution acts as a disinfectant against Bac. Typhosus.

## ''For Use in Kennels

''Scrub or clean and spray regularly at strength of 6½ ounces to 3 gallons of water or at the rate of one gallon of Pine Oil to 60 gallons of water—this makes an effective disinfectant and deodorant. If premises simply require sweetening then 2 ounces to 3 gallons is sufficient.
''. . .''

Mrs. Bender further testified that when she first used the Pine Oil she read all of the printed matter on the label, but thereafter she read only that part of the label in which she was interested, ''that related to the dog kennels;'' that she ''never measured it [the oil] accurately;'' that on July 13, 1939, the day she was injured, she was pouring the concentrated Pine Oil into a one-pound coffee can for the purpose of mixing it with water; that the disinfectant poured like a very thick liquid, ''like molasses;'' that the coffee can was on the floor and as the can containing the disinfectant was heavy she held it with two hands, and that she ''was probably squatting down more or less and taking the weight of the big can in two hands in order to pour it into the small one, and watching what I was doing. . . . Some of it splashed into my eye . . . my right eye;'' that the immediate sensation was ''pain, smart, stings,'' and she then reached for the garden hose, which was running, and turned it on her face and

eye and tried to wash out what was hurting, with very little result; that she intended to pour about one-half inch of the Pine Oil into the coffee can and then fill that can with water; that the coffee can was about five inches high and possibly seven inches in diameter; that the can of disinfectant was one-third or one-half full at the time; that she read the mixing directions practically every time she used the oil; that she had poured possibly a quarter of an inch into the coffee can at the time she was injured; that she intended to use the disinfectant on the floor of the kennel, which had a wooden floor and wooden walls; that she intended to put a lot of the oil mixture on the wall—it was a very warm day—and let it soak into the boards of the floor and walls and act as something of a preservative for the wood; that she intended to take a paint brush and lay the pine oil solution on thick; that after she bought the first can of the disinfectant she read the label on the can. "Q. Do you see any particular portion of that, that you remember as to its use? A. Well, I know that I read the whole label at one time and then I went back and read the general directions of the kennels, because that was what I was most interested in. Q. And did you rely upon what you read in the label? A. I almost always do. Q. Well, did you? A. I certainly did. Q. Did you read that portion of it which says it is safe and non-irritating? A. I did. Q. Did you rely upon that? A. Implicitly."

Plaintiff contends that the trial court erred in directing a verdict for defendant at the close of plaintiff's case. She states: "The plaintiff's theory is that the manufacturer is liable—both on the theory of negligence and breach of warranty. There was privity between the manufacturer and the purchaser, Ruth Bender. She had a right to rely on the representation on the label that the oil in the can was 'safe and non-irritating,' and the evidence shows that she did rely upon it. Plaintiff was not required to construe the

warranty to mean: After you get this liquid diluted, it will be safe and non-irritating, but until then, beware;'' that plaintiff was ''justified in relying upon the statements in the label. A manufacturer who falsely labels a product as safe when it is in fact dangerous is liable to the person injured.'' Plaintiff concedes, as she must, that the disinfectant was not intended for use on any part of the human body, and she further concedes that she did not intend to use it in her eyes nor on her body; but she argues that a purchaser of an article like the instant disinfectant has in mind that accidents happen, and that she had the assurance from the label that the undiluted disinfectant was safe and non-irritating and that if any of it should accidentally splash upon any part of her body, including her eye, no ill effects would follow.

Defendant contends: ''(1) There was no proof that the defendant falsely labeled its product; (2) No reasonable person could have construed the label on the defendant's product to mean that it was safe to put into the eye, and no warranty or representation was made by the defendant to that effect; (3) The plaintiff Ruth Bender, an intelligent woman, cannot be heard to say that she believed there was no necessity of keeping the defendant's disinfectant out of her eye; (4) Pine Oil Disinfectant is not an imminently dangerous article. It was not negligently manufactured, nor was it fraudulently or deceitfully represented. The general rule that a manufacturer is not liable to third persons not in privity with him is therefore applicable to this case; (5) No negligence of defendant proximately caused the injury; (6) Plaintiff Ruth Bender's own carelessness caused her injury; (7) No privity existed between plaintiffs and defendant, and neither the complaint nor the evidence supports a recovery upon a theory of warranty or upon any other theory.''

The weakness of plaintiff's case is that she takes from the label a few words and bases her claim upon these words, ignoring all other statements on the

label. She claims that she had a right under the law to rely upon these words and had a right to assume that the words applied to the liquid undiluted. It will be noted that the words upon which plaintiff relies are not set out in large or bold-faced type nor in a manner that would call special attention to them. What defendant represented as to the undiluted disinfectant must be gathered from an examination of the entire label. See *Carmen v. Eli Lilly & Co.*, 109 Ind. App. 76, 32 N. E. (2d) 729, 732, where it was held that the decedent was bound to consider the pamphlet accompanying the package of vaccine as a whole, and not single out and rely upon a single word or line or paragraph to the exclusion of the rest. In the instant case, plaintiff, a well educated woman, brought up in a medical atmosphere, states that just before she commenced using the disinfectant she asked her veterinary ''for a disinfectant that I could use around the kennel that would smell good and would be a good strong disinfectant,'' and that he recommended Pine Oil Disinfectant. She read the entire label when she purchased the first can and she read the mixing directions practically every time she used the oil. The label, after stating that the disinfectant is made according to the formula of the U. S. Government Hygienic Laboratory, and has a coefficiency of 3 when tested by the U. S. Department of Agriculture method, further states: ''This means that Cooper's Pine Oil Disinfectant is guaranteed to be 3 times stronger bactericidally than pure carbolic acid crystals when tested against a vigorous culture of Typhoid germs (Bacillus Typhosus) under conditions prescribed for this test.'' Under the heading, ''For Use in Kennels,'' are the directions: ''Scrub or clean and spray regularly at strength of 6½ ounces to 3 gallons of water or at the rate of one gallon of Pine Oil to 60 gallons of water . . . .'' This direction gave notice to plaintiff that in order to make the disinfectant safe, even for dogs, it was neces-

sary to add 60 gallons of water to one gallon of Pine Oil. When this direction is considered in connection with the statement that the disinfectant is 3 times stronger bactericidally than pure carbolic acid crystals, the argument that plaintiff had a right to assume from the words, "safe, non-irritating," on the label that if the undiluted disinfectant accidentally splashed into her eye—the most delicate of all of the parts of the human body—it would cause no irritation nor harm to the eye, is weak indeed. A user of the disinfectant who reads the language of the entire label is clearly apprised that the disinfectant must be diluted with water before it can be used for any of the purposes stated on the label, and the words upon which plaintiff bases her right to recover refer to the disinfectant after the addition of water in accordance with the directions given. Plaintiff knew, far better than the average individual, the effect that this very strong disinfectant, undiluted, would have upon the eyes, and, as we have heretofore stated, she concedes, as she must, that the disinfectant was not intended to be used upon any part of the human body.

The cases cited by plaintiff in support of her claim are readily distinguishable from the instant case upon the facts. To briefly refer to the cases cited:

In *Hruska v. Parke, Davis & Co.*, 6 F. (2d) 536, the plaintiff's petition alleged that the defendant was a manufacturer of chemicals and sold to druggists generally a preparation called "Camphor Solution Neutral," which it advertised and recommended for use by hypodermic injection; that the preparation, when properly made as a solution of camphor in a vegetable or animal oil, was a harmless and beneficial remedy, well known to and used by physicians and hospitals, but that defendant's preparation was made with mineral oil, which rendered it injurious to health, as defendant well knew; that the plaintiff was treated with such preparation by a physician, who had no knowledge

that it contained mineral oil and who injected large quantities of the preparation into the body of the plaintiff, and as a result the plaintiff sustained permanent injury. It was held that the petition stated a cause of action against the defendant and that the trial court erred in sustaining a demurrer to it.

In *Blood Balm Co. v. Cooper*, 83 Ga. 457, the defendant prepared and marketed a patent medicine and recommended it to the world as useful for the cure of certain diseases. The bottle containing the medicine had therewith a prescription, made by the proprietor of the medicine, which states that it is to be taken in certain quantities. The medicine with the prescription was sold by the defendant to a druggist for the purpose of being resold to persons who might wish to use it, and the druggist sold the medicine to the plaintiff, who used it in the quantity prescribed. The medicine contained an ingredient, iodide of potash, in such quantity as would prove harmful to the person using it. The Georgia court held that the defendant company was liable to the plaintiff.

In *Cahill v. Inecto, Inc.*, 208 App. Div. 191, 203 N. Y. S. 1, the defendant manufactured a hair dye, known as "Inecto Rapid," advertised it and represented to the general public that it was suitable for use as a hair dye and for application to the head as such. The plaintiff used the hair dye as directed and a few hours after applying it serious consequences followed. Her physician testified that her ailments were the result of the application of the dye. It was held that in this state of the evidence, the proof of the character of the ingredients used in the dye being solely within the defendant's control, it was required to show, in order to meet the plaintiff's case, that the composition was harmless, and that as it made no attempt to do so the judgment was affirmed.

In *Bundy v. Ey-Teb, Inc.*, 289 N. Y. S. 905, a *nisi prius* case, the defendant, a manufacturer of eyebrow

and eyelash dye containing ingredients in quantity poisonous, harmful and dangerous for use in or about the eyes, was held liable to a patron of a beauty shop whose eyes were injured by the application of the dye. In that case the label attached to the container read: "Non-Toxic Safe Lasting Ey-Tec contains no para-phenylenediamine, no aniline derivatives, no poisonous metals. It complies with all pure food and drug regulations. It requires no predisposition test. Ey-tec may even be dropped into the eyes without harm, and may be used with absolute safety. Ey-tec a product of Ey-Teb Co.—425 Fifth Ave." The plaintiff had read the label and had relied upon the statements made therein. Judgment was entered for the plaintiff.

In *Reiss v. Kirkman & Son,* 242 App. Div. 77, 273 N. Y. S. 7, the defendant was sued for damages for personal injuries alleged to have been suffered by the plaintiff through the use of a certain product manufactured by the defendant. The defendant filed a motion in the trial court, under the Civil Practice Act, for the discovery of a portion of the article constituting the basis of the action, for the purpose of analysis. The trial court granted the motion. Upon appeal by the plaintiff to the Supreme Court, Appellate Division, the action of the trial court was affirmed. The court, in its opinion, stated that the manufacturer would be liable if he represented it was harmless when in fact it was poisonous and harmful to one who purchased a package thereof from a drugstore and was injured in using it, but that if some harmful substance had been introduced into the package after it left the control of the defendant and without its fault, the rule would be otherwise.

In *Kolberg v. Sherwin-Williams Co.,* 93 Cal. App. 609, 269 Pac. 975, it was held that the manufacturer of a compound inherently dangerous to orange trees was liable to plaintiff for injuries to his orchard from the use of such compound purchased through a middleman,

the manufacturer's agent having stated to plaintiff that the compound would destroy pests without injury to the trees, leaves, or fruit.

*Henry v. Crook*, 202 App. Div. 19, 195 N. Y. S. 642, and *Hertzler. v. Manshum*, 228 Mich. 416, 200 N. W. 155, have no application to the instant case upon the facts.

Plaintiff cites *Greenwood v. John R. Thompson Co.*, 213 Ill. App. 371, wherein it was held that the law imposes upon a restaurant keeper an implied warranty that the food he serves and sells to his patrons is wholesome and fit to be eaten, and he will be liable if it proves otherwise, whether he was negligent or not.

*Dewar v. Loy*, 248 Ill. App. 396, cited by plaintiff, has no possible application to the instant case.

While plaintiff introduced evidence that this disinfectant undiluted caused injury to the eyes of rabbits and dogs, it is somewhat significant that she introduced no evidence that would tend to prove that the disinfectant, diluted in accordance with the directions on the label, if it splashed into the eye, would irritate or injure the eye.

After a careful consideration of this appeal, we have reached the conclusion that the trial court was justified, at the close of plaintiff's case, in instructing the jury to find a verdict for defendant. The judgment of the superior court of Cook county is, therefore, affirmed.

*Judgment affirmed.*

FRIEND, P. J., and SULLIVAN, J., concur.