Paul BEAN, Respondent,

v.

ROSS MANUFACTURING COMPANY,
Appellant.

No. 47433.

Supreme Court of Missouri,

In Banc.

Feb. 13, 1961.

Motion for Rehearing or to Modify
Opinion Denied March 13, 1961.

Douglas Stripp, Melvin J. Spencer, Robert B. Olsen, Kansas City, for appellant; Watson, Ess, Marshall & Enggas, Kansas City, of counsel.

Don M. Jackson, Kansas City, August L. Fowler, Marion, Ill., for respondent; Rogers, Field, Gentry & Jackson, Kansas City, of counsel.

EAGER, Judge.

An opinion in this case was written and adopted in Division One, but the case was subsequently transferred to the Court in Banc. It has been briefed and argued anew; the original opinion failed of adoption in Banc.

Plaintiff, a plumber, sustained injuries while using a drain solvent manufactured by defendant. The result was substantially total blindness. The sole theory on which the case was submitted was that defendant was negligent in not adequately warning plaintiff of the dangers inherent in the use of this product, "Rossite." The injury occurred in Belnap, Illinois, and plaintiff lived in nearby Vienna. The jury, by a nine-man verdict, awarded plaintiff $116,349.61. Motions for judgment and for a new trial were overruled. It will be necessary to state the facts in some detail. Plaintiff had been working for approximately six years as a plumber, the first three as an apprentice, the last three as a licensed journeyman plumber. He was not quite 45 years old at the time in question; he had graduated from High School, and had attended two colleges for periods totaling approximately three terms. In one of these he had taken a

course of about four months in general chemistry. He had made no study of plumbing, except in and through the practical experience of working with others; all of this work was done as an employee of Upton Bros. of Vienna, Illinois, a town of 1,200 or 1,300 population. On the ill-fated occasion, February 22, 1955, plaintiff and one Ray Evers, an unlicensed apprentice, were called to open a stopped-up drain in the basement of the grade school building at Belnap. Evers had worked for Upton about three years. The drain pipe was three inches in diameter. The men first tried a "stool auger," a flexible apparatus. or cable which is projected from an encasing handle by a crank; after they had inserted two or three feet of the auger, it hit something which felt or sounded like metal. Getting nowhere with this, they tried water pressure through a "test plug and hose." This plug (highly material here) was a metal device with a hard rubber expanding gasket or base which could be tightened by a thumb screw to fit the pipe dimension; above this was about a foot of steel pipe, slightly bent. Plaintiff and his associate connected to this device a hose leading from the building water supply; they tightened the plug with pliers, and turned on the water. The exact water pressure was unknown, but it was between 18 and 40 pounds per square inch. This pressure did not force the plug out, but it accomplished nothing toward opening the drain. The plug was removed and the hose taken from the plug; plaintiff suggested to Evers that he get a can of Rossite from the truck. While Evers was gone, plaintiff dipped out the water in the drain until it was about eight inches below the floor level, and capped the test plug with a solid fitting. When Evers returned he poured the entire can of Rossite, 20 ounces, into the drain, with plaintiff squatting beside him; plaintiff immediately inserted the test plug; during this time both remained squatted down by the drain, and plaintiff tightened the wing nut with pliers "fairly tight," but not as tight as he had for the water pressure. Plaintiff testified that the reason he used the test plug was to keep the odor or "stink" out of the room, and he specifically denied trying to force the obstruction with pressure. After thus tightening the plug, both stood up. A "little bit" later, possibly two minutes or so, plaintiff saw a few bubbles around the edge of the plug; he squatted down again, put his left hand on the plug, and reached toward the wing nut with his pliers to tighten it more. He said that he was doing this "more or less to have something to do," and with no particular motive or reason. At that time, either just before or just after he reached the wing nut, there was a sound like a "shot-gun," the test plug blew out, and plaintiff felt a terrific pain in his head. Some of the liquid from the drain had blown out across his face, eyes and ears as he squatted near the drain. Evers, standing, felt his eyes sting but suffered no serious effects; there were little blisters on his face. Evers testified that the nine or ten foot ceiling was "all white," and that there was much of the whitish material on the floor. Evers promptly got help for plaintiff, and brought vinegar which plaintiff called for; by that time plaintiff had crawled to the faucet and had thrown water in his eyes and on his face. A doctor came, and as soon as possible plaintiff was taken to a hospital and to an eye specialist. Days later he was transferred to a St. Louis hospital and to the care of other specialists. There will be no need here to relate the treatment or his progress. The ultimate result was total blindness, except for light perception, and the ability to see the movement of a hand at approximately six inches with one eye and one foot with the other.

Rossite, manufactured by defendant, consists of sodium hydroxide (caustic soda or lye), sodium nitrate, an alloy of aluminum and zinc, and casein. Sodium hydroxide is extremely caustic to human tissues, which means that it burns or destroys by chemical action. In the presence of water Rossite induces several chemical reactions; the aluminum reacts with the sodium hydroxide,

forming hydrogen gas and certain by-products; some of the hydrogen gas reacts with the sodium nitrate to form ammonium gas and some of it escapes; some of the ammonium gas is dissolved in the water, and some of it also escapes. A temperature of approximately 180 to 212 degrees would normally be created by such a mixture of Rossite and water as was used here. The casein, a milk product, forms a sort of foam over the reaction, filters out some of the gas bubbles, and also forms a "skin" over any gas bubbles which may be ejected. There was much expert testimony from chemists, pro and con; each of these men had made calculations or conducted experiments, or both. The stated estimated pressure on the "test plug" here varied from 486 pounds per square inch (by calculation of one witness) down to 42 pounds by one experimental method and to 12 pounds on another. The heat and churning created by these chemical reactions was said to operate effectively upon congealed greases, animal and vegetable matter found in ordinary clogged drains. It seems to be undisputed that in this particular occurrence a highly caustic mist, carried by bubbles of gas which had passed through the caustic liquid, escaped violently when the plug blew out. The space within which gases are confined necessarily bears a direct relation to the pressure created. One witness testified that in his experiment, with an open three-inch drain and similar proportions of Rossite and water, droplets of the mixture surged from six to eighteen inches above the drain and approximately twenty-four inches out to the sides. We deem it wholly unnecessary to detail further or to compare the highly controversial and complex testimony concerning the pressures created or the respective merits of the different experiments and calculations. We know from substantial, direct evidence to which we are required to give credence, that there was enough pressure to eject this plug violently and to spray the caustic mist and bubbles around the nearby area and to the ceiling. We are not concerned with further technical details.

As already stated, the case was submitted by plaintiff upon the sole theory that defendant did not adequately advise and warn plaintiff of the dangers inherent in the use of this product. This, of course, requires a detailed consideration of the label and some reference to plaintiff's previous experience and knowledge. We take these in inverse order. Plaintiff's education has been stated. In his plumbing experience, all in small towns without sewer systems, he had worked on water and heating systems, hot water heaters, drains and septic tanks; he knew that water when heated expands. He had some scant knowledge of safety valves. He had used Rossite to some extent for at least three years and previously had used a very similar product called "Blue Seal." He had only used Rossite in kitchen sinks, in wash basins and very occasionally on a tub drain; he had not previously used more than approximately one tablespoonful at a time, not measured; he had noticed that this made the drain pipe warm, but not so hot that he could not touch it. In this previous use, he and his helper had generally held a rubber suction cup or plunger over the drain in order, he said, to keep out the very disagreeable odor or "stink." We interpolate here that some of the experts testified that the only distinguishable odor from Rossite was of ammonia, and that any other smell, if present, must have come from decayed matter in the drain. Plaintiff had occasionally seen a yellowish foam come up around the edge of the plunger. He had never used Rossite on a basement drain. He knew nothing of the elements composing Rossite, nor would he have known anything of their properties or chemical reactions, had he known their names. He did not know, according to his statement, that it would create any type of explosive reaction, even if he plugged the drain. He was permitted to testify that he would not have used the plug if he had known that the product would explode thus. He further testified that he had no knowledge of any danger in plugging the drain.

The can was four and one-half inches high and three and three-eighths inches in diameter. The directions and cautions were printed *on the can*, not affixed by paper label; these appeared in two rather wide columns, with some words and phrases emphasized in slightly larger print, some in still larger red, and the word "Poison" in very large black print; the latter word carried the real emphasis of the whole label. We set out only the most material parts, as follows (with all wording in parentheses ours, and with the original separation of lines not shown here in all instances): "Read and Follow Directions Carefully and Shake Can before Removing Cover. (Black) For Sluggish Drains (red) * * * For Complete Stoppages (red) Stoppages may occur any place between trap and sewer. For stoppages within a foot or two of the trap use one-quarter can of Rossite every five minutes followed by half cup of water until entire can has been used. If obstruction is further away, more Rossite is required to properly chemicalize the additional water; approximately one can to every three feet of water that is between opening and stoppage. Do not plug or close opening and stand away far enough so effervescent mixture will not touch person or clothing. (This sentence carried no emphasis and was in the smallest type used, as was most of that column.)

"Let remain 30 minutes or overnight then flush with plenty of hot water. If Rossite does not open drain, call plumber because stoppage may be caused by wood, glass, metal or similar solid substances which Rossite will not remove. Be Sure and Advise Plumber Rossite Has Been Used, otherwise he will burn his hands while at work. * * *

"Shake Well before Removing Cover (red) Rossite is a Patented chemical that has been developed for the particular use of the plumbing trade. It is preferred because it works towards the obstruction with a rapid triple action that does twice the work in half the time it would take ordinary solvents. * * * Rossite contains no acid and will not injure enamel-ware, pipes or connections unless made of Aluminum. Rossite will damage Aluminum soil pipe and drainage connections.

"Caution (red and somewhat enlarged) Complete directions are printed on the left. Read them carefully before opening can. Do not permit Rossite to come in contact with face, hands, clothing or an open flame. Keep away from toilet bowl and Aluminum and do not use Rossite where Aluminum soil pipe or drainage fittings are installed.

"Poison (very large type) This can contains sodium hydroxide and Bauxoleum. * * * if Taken Internally give vinegar, or juice of lemon, grapefruit, or orange, copiously. Follow with olive oil.

"For External Burns flood with water, then wash with vinegar.

"In Eyes wash out with 5 per cent boric-acid solution. Call Physician.

" *Reg. U.S. Patent Office."

Some confusion exists concerning the precise knowledge which plaintiff had of the directions and cautions at the time of his injury. This becomes material on several points raised. He had used both Blue Seal and Rossite, adding somewhat to the confusion. We glean the following, however, as the gist of his testimony, though perhaps inconsistent in and with itself, in some respects. (Parentheses are ours.) He had read the Rossite label more than once, including the directions, and had read the words "do not plug or close the opening"; he did not recall when he had last read the label. He did not read any part of the label on the day in question nor was it discussed; referring to the directions, he testified (at different points in his testimony): " * * * I cant say that they were particularly on my mind * * *"; " * * * at the time I used the plug I do (did) not specifically remember the instruction * * * It never entered my mind. I never really thought of it that day when I put the plug in" (from his deposition, re-

affirmed at the trial); that, nevertheless, he did know on that day, generally, what the "can said," and that the words "do not plug or close opening" were on the can; that "* * * I thought of them (directions), I mean in a sense of the word of using them * * * I wouldn't say that I did entirely (i. e., use Rossite) without ever thinking * * *"; that the reason he did not follow the instructions was that "* * it did not say anything at all about anything that would happen * * * to me it could have meant that maybe this Rossite * * * wouldn't do the proper action it was supposed to if plugged." (From deposition, reaffirmed.) He did recall the statements that Rossite would burn the hands, not to use it on aluminum, and that vinegar was mentioned as an antidote; in conclusion, he testified that, regardless of what he thought about the instructions on that day, he knew what the can said. (For whatever the latter may be worth.)

After plaintiff's injury Evers, his helper-associate, dug up the drain. It consisted of approximately 18–24 inches of vertical three-inch pipe, with a "P" trap below it; the trap is here; to the uninitiated it appears more like a "U" with about a six-inch extension leading out from the point on one side. The "U" is all we are concerned with. At the bottom of the "U" was found a solid mass of hard cement or concrete and Evers had to break a hole in the pipe to discover this. Ordinary stoppages of food, grease, etc. usually occur beyond the trap; plaintiff had only found one that did not and his employer had seen none; plaintiff thought that here he had at least a three-foot column of water back of the stoppage. He had never previously used a test plug with a drain solvent. Although Evers poured the Rossite in, plaintiff seems to have been more or less in charge of the job as the licensed plumber, and he does not seek here to shift the responsibility for what was done. Plaintiff's employers had purchased 528 cans of Rossite in the period from April 15, 1952, to September 4, 1956. The opinion was ex-

pressed by at least one of plaintiff's experts that Rossite was an inherently dangerous product.

■■ Defendant's first point is the alleged error in refusing to direct a verdict, as preserved in its after-trial motion. This point is subdivided as follows: (a) that the label was adequate and no negligence was demonstrated; (b) that plaintiff was contributorily negligent as a matter of law; (c) that the sole proximate cause of plaintiff's injury was his own failure to recall and follow the warnings and directions given; and (d) that plaintiff failed properly to allege his own due care, as required by Illinois law. The parties concede that the substantive law of Illinois controls, in so far as it has been declared and is applicable. It will be impossible to discuss all the cases and texts cited pro and con, on any point; and there is no case, cited or found, which is really very close to this one on the facts, anywhere. We have determined that plaintiff made a submissible case of negligence on the failure adequately to warn. Before discussing any authorities, we note the following: the predominant warning or caution on the label is of "POISON" coupled with antidotes "If Taken Internally"; following, water and vinegar are suggested for "External Burns," and "In Eyes wash out with 5 per cent boric-acid solution. Call Physician." There appears previous to this a caution concerning *contact;* also, the statement: "Do not plug or close opening and stand away far enough so effervescent mixture will not touch * * *." We are unable to say that all reasonable men would consider this label as an adequate warning that Rossite, mixed with water, would explode violently if confined. The use of the word "effervescent," in our opinion, lessened any effect which the "stand away" caution might otherwise have had. The words "do not plug * * * and stand away * * *" bore no added emphasis in size or color, and were only explained by the suggestion that the "effervescent" mixture might touch "person or clothing." The suggestion that the

plumber might "burn his hands" evidently referred to the danger of one's putting his hands in the mixture. This product was, as this occurrence demonstrated, inherently dangerous, if confined with water. Whether a sufficient warning was thus given is a question of fact. Nor do we feel that the fact that plaintiff was a licensed plumber alters this conclusion. His experience was almost entirely practical, and he knew nothing of the properties, elements or chemical reactions of the product. We decline to hold, as a matter of law, that defendant owed him no further duty to warn merely because he was a licensed plumber. His background, experience and knowledge were matters properly to be considered as fact issues on the duty to warn, and also in deciding whether he was himself negligent. Certainly the danger of a violent explosion from a drain solvent and water, though confined, is not a thing shown by the evidence to be generally known to the plumbing trade. Certain statements relied on from Rosebroch v. General Electric Co., 236 N.Y. 227, 14 N.E. 571, concerning the customs and general knowledge of the trade, are distinguishable. Defendant relies strongly on the cases of Bender et al. v. William Cooper & Nephews, Inc., 323 Ill.App. 96, 55 N.E.2d 94, and McClaren v. G. S. Robins & Co., 349 Mo. 653, 162 S.W.2d 856. In Bender the plaintiff splashed some disinfectant in her eye while pouring some of it out of a one-gallon can in order to dilute it. The label stated that it was "safe and non-irritating," but also stated that the undiluted product was three times stronger than pure carbolic acid crystals and that it should be diluted 60 to 1 with water. Plaintiff sought to rely on the words above quoted, admitting that she had read the whole label. The court, noting that she was an educated woman and knew that this was a strong disinfectant, held that she could not rely merely on a few words out of the label, especially words which were not given prominence, and ignore the remainder. A verdict was directed for the defendant, for the reason that plaintiff had no

right to assume that the undiluted product would cause no harm to her eye; she had used the product in dog kennels, always diluted it, and knew that it was a very strong disinfectant. The danger there was obvious to a reasonable person, and, while the opinion declares the Illinois law so far as it goes, it is not controlling here. In McClaren, supra, the injury occurred in Illinois. The Missouri court held that labels on cans of carbon tetrachloride (designated as such) containing the words: "Volatile Solvent, Use With Adequate Ventilation. Avoid Prolonged Breathing," was sufficient. This form of label was in general use by manufacturers of the product. Decedent had been using the product from an open bucket, sloshing it around the inside of a boiler with a rag, to clean out the grease; he had worked there, "uncomfortably hot," for from three to six hours. He died from the fumes. The court held that the Illinois "Poison" statute was inapplicable, but also held that there was no negligence in failing to give a further warning; the court was influenced largely by the fact that defendant had exercised the same degree of care as had all others in a like business. There was no such evidence in our case, even if that factor should be controlling. Nor are the facts sufficiently apt to be persuasive here.

■ Defendant also cites cases to demonstrate nonliability in the event of the misuse of a product. Marker v. Universal Oil Products Co., 10 Cir., 250 F.2d 603; Shaw v. Calgon, Inc., 35 N.J.Super. 319, 114 A.2d 278; E. I. Du Pont De Nemours & Co. v. Baridon, 8 Cir., 73 F.2d 26; Oettinger v. Norton Co., D.C.E.D.Pa., 160 F.Supp. 399; 3 Cir., 253 F.2d 712; Hunter v. E. I. Du Pont De Nemours & Co., D.C. W.D.Missouri, 170 F.Supp. 352. The principle is well recognized; we have considered all these cases, but we cannot say here that there was a "misuse" to the extent that defendant should not have foreseen the probability of such a use. It anticipated such a use to the extent that it gave a more

or less minimum warning, to wit: "do not plug or close opening and stand away * * *." We cannot say as a matter of law that plaintiff's act was a "totally unanticipated misuse" (Marker, supra) or that the warning was sufficient; the question of warning was therefore one for the jury, which, of course, might consider the nature and circumstances of plaintiff's actions. Actually the so-called "misuse" arises again under the contention of contributory negligence. The supplier of a chattel is subject to liability for injury in its use by another when the supplier knows or should know that its use is or is likely to be dangerous and when there is no reason to believe that the user will realize this, if, further, he fails to use reasonable care to warn. Restatement of Torts, § 388; Haberly v. Reardon Co., Mo., 319 S.W.2d 859; Beadles et ux. v. Servel, Inc. et al., 344 Ill. App. 133, 100 N.E.2d 405; Orr v. Shell Oil Co., 352 Mo. 288, 177 S.W.2d 608; Pease v. Sinclair Refining Co., 2 Cir., 104 F.2d 183, 186, 123 A.L.R. 933. In Pease, supra, the court said, loc.cit. 186: "But as pointed out in Tullgren v. Amoskeag Mfg. Co., 82 N.H. 268, 276, 133 A. 4, 8, 46 A.L.R. 380, 'it is not necessary that damage as a more rather than less probable result should be anticipated. * * * Danger consists in the risk of harm, as well as the likelihood of it, and a danger calling for anticipation need not be of more probable occurrence than less. If there is some probability of harm sufficiently serious that ordinary men would take precautions to avoid it, then failure so to do is negligence. * * * The test is not of the balance of probabilities, but of the existence of some probability of sufficient moment to induce action to avoid it on the part of a reasonable mind.' " Illinois recognizes liability without privity in the case of an inherently dangerous article. Beadles, supra. In Haberly, supra, where a father permitted his paint brush immersed in "Bondex" (containing lime) to come in contact with his child's eye destroying the sight, our court said (in a divided opin-

ion), loc cit. 863 of 319 S.W.2d: "And we think a jury reasonably could have found also that defendant, under the facts of this case, reasonably could have anticipated that the hazard or risk of Bondex lodging in the eyes of those noted included a wide variety of ways, usual, unusual, unique, peculiar, and bizarre, in which paint might get into one's eye, and included the way, as in the instant case, involving an unexpected movement by a helper such as plaintiff. That must be true because, as we see it, it was not the exact manner of the occurrence (the particular freak accident, as defendant calls it) which must have been reasonably foreseeable in the judgment of a jury to inflict liability on the defendant; rather, it was the hazard or risk of Bondex by some accidental means lodging in the eye of one helping the user or otherwise in the vicinity of user." That case was governed by New York law, but the principles stated were largely those of general law, as well.

In the present case there can be no doubt of defendant's knowledge, or means of knowledge, for it had prepared the product over a period of years with the advice of a chemist. And see Kieffer v. Blue Seal Chemical Co., 3 Cir., 196 F.2d 614. A very informative article dealing with the necessity and adequacy of warnings in connection with the sale and use of dangerous products appears at Vol. 41 Va.L.R., p. 145. This, in part, constitutes a comment on the recent case of McClanahan et al. v. California Spray-Chemical Corp., 194 Va. 842, 75 S.E.2d 712, and the author goes to some pains to distinguish between mere directions for use and adequate warnings of hidden dangers. And see, generally, on the duty to warn and its violation: Maize v. Atlantic Refining Co., 352 Pa. 51, 41 A.2d 850, 160 A.L.R. 449; Martin v. Bengue, Inc., 25 N.J. 359, 136 A.2d 626; Tampa Drug Co. v. Wait, Fla., 103 So.2d 603; Farley v. Edward E. Tower & Co., 271 Mass. 230, 171 N.E. 639, 86 A.L.R. 941. We are not overly impressed with plaintiff's arguments regarding "social responsibility" as affecting our determina-

tion on principles of "fairness and justice," if (as it seems) this argument would urge liability without demonstrated legal fault as we have heretofore known it. Except in certain limited fields we have not yet arrived at that point, and we have no intention of initiating such a principle now.

The next, and a serious, question is that of contributory negligence. Before discussing the merits, we must pass on a matter of pleading. In an Illinois negligence case a plaintiff is required to allege and prove the exercise of due care. We have recently held that in a case arising under Illinois law this requirement is substantive. O'Leary v. Illinois Terminal R. Co., Banc, Mo., 299 S.W.2d 873; Robinson v. Gaines, Mo., 331 S.W.2d 653. Plaintiff here did not include such an allegation in his second amended petition on which the case was tried. Defendant's answer, as amended shortly prior to trial, directly and specifically alleged negligence on the part of plaintiff which caused or contributed to his injuries. At the beginning of the trial plaintiff asked leave to amend; defendant objected and the court denied the request, but permitted plaintiff to file a reply in which he stated that he was at all times exercising due care for his own safety. Defendant insists that this action was improper and also ineffective in that the petition still did not state effectively a claim for relief. Of course, plaintiff here had the burden of proving his freedom from contributory negligence, notwithstanding defendant's affirmative plea. O'Leary, supra. That case was decided after the present suit was instituted; there, and in the cases there referred to, the discussion primarily concerned the burden of proof concerning plaintiff's negligence or freedom from negligence, although the requirement of pleading on plaintiff's part was not overlooked. It has been said in Missouri that a cause of action cannot be stated in the reply. Dreckshage v. Dreckshage, 352 Mo. 78, 196 S.W.2d 7; Webster v. Joplin Water Works Co., 352 Mo. 327, 177 S.W.2d 447; Kent v. City of Trenton, Mo.App., 48 S.W.2d 571. Generally, that is true. But here, the answer affirmatively put in issue the question of plaintiff's due care, and it seems that under the law of both Missouri and Illinois, at least when the reply joins in the issue, this cures the omission of an element from the petition. State ex rel. Fidelity & Deposit Co. of Maryland v. Allen, Mo., 85 S.W.2d 455, 461; Gray v. North American Mutual Union, 249 Ill.App. 74, 78. It is also contended here that plaintiff's allegation of due care was a mere conclusion and therefore ineffective, not being a statement of fact. Such an allegation has been held sufficient in Illinois. Van Middlesworth v. Hill et al., 161 Ill.App. 592, 595; Consolidated Coal Co. of St. Louis v. Scheiber, 65 Ill.App. 304. Moreover, when we consider here that defendant invoked the issue of contributory negligence by specific allegations, plaintiff's general allegation in the reply should be sufficient. Defendant also complains here that the Illinois Statute of Limitations prevented a substantive amendment at the time of trial. The brief answer to this is that § 46, Ch. 110, Illinois Revised Statutes 1957 provides that an amendment is not barred by limitations if the matter disclosed in the amendment "grew out of the same transaction or occurrence * * *," even though the purpose is to allege a condition precedent, originally omitted. That requirement was substantially met here. And see particularly Fonyo v. Chicago Title and Trust Co., 296 Ill.App. 227, 16 N.E.2d 192, 193; also The Metropolitan Trust Co. v. Bowman Dairy Co., 369 Ill. 222, 15 N.E.2d 838, 842. We conclude that the issue of plaintiff's exercise of due care was properly in the case.

Defendant says that plaintiff was negligent as a matter of law: (a) in using a whole can of Rossite at one time; (b) in plugging the drain; and (c) in squatting within an arm's length of the drain, all contrary to the directions and warnings; and that in any event he was negligent in either forgetting or failing to heed the

warnings. There is no doubt here that if plaintiff was negligent, his negligence contributed to the injury. Hamilton v. Laclede Electric Co-op., Mo., 294 S.W.2d 11, 17. To the point that forgetfulness, even momentary, does not excuse what would otherwise be negligence, defendant cites: Bryan v. Sweeney, 363 Mo. 1024, 256 S.W.2d 769; Bender v. William Cooper & Nephews, Inc., 323 Ill.App. 96, 55 N.E.2d 94, already discussed. In Bryan, an experienced electrician forgot momentarily that a ladder on which he was standing was very wet, as he had noticed immediately before his injury; he knew well the danger of that condition in handling electric currents. In Bender, supra, already discussed, it was established that plaintiff was familiar with the label, was an educated woman, and knew that the undiluted disinfectant which she was pouring (and which splashed in her eye) was very strong. It is difficult to tell whether that case was decided on the question of contributory negligence or not. However, that plaintiff's knowledge of the potency of the material, as she poured it, distinguishes the case from ours where, as ruled in our first point, there is a question of fact as to whether plaintiff was adequately warned by the label of the pressures and explosive qualities of the product, even if he had the cautions of the label in mind. The cases of Shaw v. Calgon, Inc., 35 N.J. Super, 319, 114 A.2d 278, and Oettinger v. Norton Co., D.C.E.D.Pa., 160 F.Supp. 399; 3 Cir., 253 F.2d 712, are distinguishable by reason of the fact that sources of knowledge were immediately available to those respective plaintiffs, or knowledge had already been acquired. Other cases cited by defendant are not in point. In holding previously that the label[1] was not, as a matter of law, sufficient to warn of the inherent danger, we have indirectly held that plaintiff did not, necessarily and *as a matter of law,* have notice of that danger from the label. And we find that there was not sufficient in his general background and

experience to establish his knowledge independent of the label, as a matter of law. It has been said, 41 Va.L.R., loc. cit. 163) that a defense of contributory negligence in a failure to warn case, involves a "circuity of reasoning"; this, for the reason that plaintiff cannot have contributed negligently to his own injury "when he had no way of reasonably ascertaining" the danger. We do not agree, for this statement begs the questions of the adequacy of the particular warning under the particular circumstances involved, and of plaintiff's consideration of the warning. Here, as already indicated, the sufficiency of the label was a question of fact. And it is only a failure to exercise due care after a proper warning, or with other knowledge, that constitutes contributory negligence. Tampa Drug Co. v. Wait, Fla., 103 So.2d 603. Under these circumstances we cannot say that either the label or plaintiff's independent knowledge constituted a warning so adequate as to make him negligent as a matter of law; or that he acted as he did because of forgetfulness. If he was never (even when reading) adequately advised, we certainly may not say that in acting as he did, though without a full and complete memory of the label, he was negligent as a matter of law. His testimony as to just what was in his mind and memory at the time was somewhat hazy and inconsistent, but he cannot be held conclusively negligent because he did not have fully and accurately in mind an insufficient label, *if such it was.* Without discussing the label in further detail, we note again that the "Do not plug * * * and stand away" —appeared in a rather subordinated place and in small type; and it was combined with the words "effervescent mixture." The latter phrase, to us, seems to detract from the prior warning and perhaps imparts some idea of false security; to some degree, the same may be said of the suggestion that eyes be washed with 5% boric acid. See Maize v. Atlantic Refining Co., 352 Pa. 51,

1. We have used the term "label" rather loosely, to indicate all cautions and directions appearing on the can.

41 A.2d 850, 852, 160 A.L.R. 449. The idea of "Poison" was predominant; the directions concerning the amounts of Rossite to be used (not combined with warnings as such) are sufficiently ambiguous to leave a fact question as to their meaning. If plaintiff was actually trying to force the obstruction with the test plug after other methods had failed, knowing that this would create substantial pressure, and in contravention of the directions, then he might well be said to be negligent, conclusively. But he said he was *not* doing this and that he had no knowledge of the pressure to be created, and there is nothing in the evidence or the circumstances to prove conclusively that this was untrue. His assertions regarding the "odor" or "stink" may seem unreasonable to some, but there remains a fact question. We cannot rule this point on a disbelief of plaintiff's testimony. We find nothing in the law of Illinois contrary to our conclusions here. We are unable to say that all reasonable persons would find plaintiff negligent under the circumstances present here.

The next point made is that the sole proximate cause of plaintiff's injury was his failure to think of or follow the warnings and directions, and his own intervening acts. This, actually, involves merely a reconsideration of the question of contributory negligence and, to a lesser degree, the existence of defendant's own negligence. Plaintiff's own acts, in order to bar recovery as a superseding and intervening cause, must have been negligent acts. If defendant was guilty of negligence (and we have held this to be a fact question) and if that negligence concurred substantially in causing the result, it may not be absolved unless plaintiff was *negligent*. It has been said that the defendant's act is a cause if it is a material element and a substantial factor in bringing about the result. Prosser on Torts 2d Ed., § 44, p. 221; Restatement, Torts, § 431. We have already held that it was for the jury to say here whether plaintiff was negligent or not. Defendant argues that no causal con-

nection was shown between its alleged negligence and the injury; that if plaintiff paid no more attention than he did to these directions, he would not have paid any more to better ones. It would be pure speculation for us to so hold. Plaintiff did claim that he had the directions and warnings generally in mind; who can say what he would have done if he had read on the label in prominent type "Explosive, if Confined," or some similar warning? This does not involve a mere "possibility" as defendant argues. We may not rely wholly upon the excerpt emphasized from plaintiff's testimony that, at the time, the warning "never entered my mind." The effect of this statement is limited and expanded by his other testimony concerning his recollections of the label and what was in his mind; also, the testimony that he had no idea (and had never received any) that the product would explode, if confined, and that he would not have plugged the drain had he known this. This court may not sift his testimony, so long as a reasonable probability appears that he would have heeded a different and more adequate warning. The cases cited do not, in our opinion, indicate or require a different result. See, generally, as applicable on this point: Maize v. Atlantic Refining Co., 352 Pa. 51, 41 A.2d 850, 160 A.L.R. 449; Kieffer v. Blue Seal Chemical Co., 3 Cir., 196 F.2d 614; Blue v. St. Clair Country Club, 7 Ill.2d 359, 131 N.E.2d 31. The last case cited states the Illinois rule of proximate cause. In Haberly v. Reardon Co., Mo., 319 S.W.2d 859, 864, a submissible case on causation was held to exist on facts probably less strong for plaintiff than ours. While that holding was stated to be "in accord with the substantive law of New York," it actually represented general law as well, and the court's idea of the logic of the situation. The question of causation here was for the jury.

We come next to the vexing question of instructions. Considerable confusion was caused by the number of instructions offered by the defendant, and we recognize the difficulty encountered by the trial

court on that account. We have determined that one highly material issue was not submitted to the jury and that one other issue was submitted in a misleading manner; we shall largely confine our discussion to Instructions No. 1 and No. 28. Considered in bare outline: No. 1 submitted that Rossite was distributed to the "plumbing trade," but that defendant knew that *other persons* used it. It hypothesized that the product was inherently dangerous, the essential physical facts of plaintiff's injury, that plaintiff "did not know and in the exercise of ordinary care would not have known" of the pressure and danger, that plaintiff at all times was exercising such care "as *an ordinarily careful and prudent person*" would have exercised, that the directions and warnings on the label did not adequately warn "*a person* using same" of the danger of an explosion if the drain was plugged, that defendant was thereby negligent, and that plaintiff was blinded "as a direct result of the said negligence." Upon a finding of all hypothesized facts, with certain facts stated to be admitted, the jury was instructed to find for the plaintiff.

Although defendant makes several objections to this instruction, we find it unnecessary to consider them all. The major defects which we find are two. First, the instruction fails entirely to take into consideration the plaintiff's background, including his education and experience, and it deals with defendant's duty to him and with his own duty of care, as with that of any *ordinarily prudent person*. True, the court gave later, at defendant's instance, an instruction using the same general terms, but defendant was entitled to take issue on a theory of liability adopted by the trial court, without waiver. The other defect is that the instruction wholly ignores any and all reference to the consideration which plaintiff may actually have given to the directions and cautions on the label. It may have been thought that this element was incorporated in the references to plaintiff's knowledge and means of knowledge. We do not hold, and need not hold, that this

latter omission in Instruction No. 1 would alone be reversible except for the refusal of Instruction No. 28. In the latter instruction, offered on the defense of contributory negligence, it was submitted that: even though plaintiff had previously read the caution and directions, if he failed to do so with due care, or if he did so without sufficient care to enable him to remember and follow them, or if he had forgotten them and failed to refresh his memory by reading them again, and if he was thereby negligent and such negligence directly contributed to his injury, then the verdict should be for the defendant. The refusal of No. 28 and the giving of No. 1 must be considered together.

Primarily, the case was submitted on the question of the adequacy or inadequacy of the cautions and directions given,—i. e., as such might concern the actual danger which plaintiff encountered. The adequacy should have been considered as the directions and cautions appeared to plaintiff, a plumber, or to members of the class to which he belonged with similar experience. Clearly, he had some experience and some education which distinguished him from people in general. We have detailed that evidence in our statement of the facts and we will not repeat it here. The instructions should have taken these facts into consideration. It was for the jury to say whether plaintiff's background should have furnished him any means of knowledge of the danger, in the light of the directions and cautions actually given; and the jury should not have been precluded from doing so by telling it to consider merely the care of an ordinarily prudent person. In fact, this instruction assumes that plaintiff had no knowledge beyond that of an ordinary person.

We may not justify the refusal of Instruction No. 28 by virtue of the argument that plaintiff's testimony that he had read the directions and cautions was uncontradicted. The truth of oral testimony is always for the jury. The instruction was appropriate "even though" plaintiff had read

the label previously. Here, there was much confusion as to what plaintiff recalled or did not recall from the label, and what he thought of or did not think of at the time of the occurrence. His very actions in using the whole can of Rossite, in plugging the drain, and in squatting within a foot or two of it, were sufficient to indicate enough lack of understanding or recollection of the directions and cautions to require a specific submission. He had never previously used a whole can in a drain nor had he plugged a drain when using it. Instruction No. 28 was offered on the theory of contributory negligence. Plaintiff could not have been free of negligence unless he gave to these directions, *at some time*, a sufficient study to enable him to understand and recall their substance before he made this use of the product. The existence of contributory negligence here as a matter of law has been a close and vexing question. We have decided against that contention. Yet, the very existence of such a situation makes it imperative that the jury be properly instructed on such a material element affecting that question. *No* instruction was given here dealing with the question of contributory negligence in plaintiff's consideration of the label; the jury was not even required to find that he had read it, except perhaps through generalities of knowledge and proximate cause. The adequacy of a label is of no value if it is not read and considered. Defendant maintained throughout the trial, and here, that the directions and cautions given constituted an adequate and sufficient warning of danger, if properly considered. The two contributory negligence instructions which were given for the defendant involved knowledge or means of knowledge independent of the label on the can; at least, neither even mentioned the directions or cautions. Plaintiff's argument that if the jury found that the warning was inadequate plaintiff could not have been guilty of contributory negligence, is beside the point. Inadequacy of notice in the label was submitted on the question of defendant's negligence; con-

tributory negligence involves knowledge or means of knowledge from any source, including a fair consideration of the label actually furnished; and to be actually inadequate from plaintiff's standpoint, the warning given should be found to be inadequate after a fair consideration of its contents by one in plaintiff's situation, and of its meaning to him. Plaintiff himself submitted his exercise of due care, as required under Illinois law, and the question of contributory negligence was a vital factor, to be considered along with the submitted "inadequacy" of warning. We hold that the giving of Instruction No. 1 and the refusal of Instruction No. 28 constituted reversible error.

It is unnecessary to discuss other refused instructions about which defendant complains. There were entirely too many of these. True, there is no rule that separate issues may not be dealt with separately, but the trial court has a rather wide discretion in dealing with instructions which are too numerous. On the merits, however, we are unable to say that the refusal of any of these instructions constituted reversible error. In certain respects they were repetitious of given instructions, some contained undue emphasis on certain isolated factual matters, and those dealing with proximate cause involved a measure of speculation. In preparing instructions on another trial the parties may further consider the criticisms appearing in the several excellent briefs filed here.

 Sundry other points are briefed which may or may not occur at another trial. We shall not burden an opinion already too long with a discussion of these. The argument that the verdict is excessive obviously requires no discussion now. One additional point should be mentioned, however, since it is most likely to recur if not discussed. Defendant sought by evidence and offers of proof to show that a workmen's compensation insurer, Bituminous Casualty Company, was interested by way

of subrogation, that it had paid all the doctors' and hospital bills, and that plaintiff was receiving from it approximately $130–$135 a month until a total of $9,250 had been paid, and thereafter $92.50 a month for life. The total value of these benefits was said to be a sum of from $36,000 to $52,500. (We do not quite understand the variation, but it is immaterial.) It appears that such an insurer would have a right of subrogation under Illinois law and that plaintiff's attorneys were representing the insurer as well as the plaintiff. Defendant's theory of the admissibility of this evidence was: (a) that it would tend to show the interest and possible bias of plaintiff's medical witnesses; and (b) that it tended to refute plaintiff's evidence of his "mental anguish" by reason of his anticipated inability to educate his children. We note first that there was no controversy on the medical aspects of the case, and no question of the reasonableness of any medical or hospital bill. Defendant produced no medical witness. There was nothing in the record to indicate any bias, interest or prejudice on the part of any medical witness, or any prior connection of any of them with the named insurer. Under these circumstances the mere fact that the insurer paid those bills could have no substantial bearing upon the credibility of this testimony. The cited case of Houfburg v. Kansas City Stock Yards Co., Mo., 283 S.W.2d 539, is clearly distinguishable. There it appeared from an offer of proof that the physician had made reports to the insurer which conflicted with his testimony at the trial and that he had previously been employed and paid by that insurer. The court rejected the offer and the proffered exhibits. This court on appeal recognized the general inadmissibility of such testimony (citing Pritt v. Terminal R.R. Ass'n of St. Louis, Mo., 251 S.W.2d 622, where the question is well discussed), but ruled that the evidence was admissible there because it was necessary in order to "evaluate the testimony of a witness." We do not question that decision, but we find no foundation in our record for any such inquiry. The proffered evidence was wholly irrelevant, so far as this record shows, to prove any interest or bias. Certainly the interest of a witness may be shown by cross-examination, when any matter is presented which truly tends to show interest, bias (State v. Pigques, Mo., 310 S.W.2d 942, 947) or hostility toward a party. Nothing of the sort is present here. On the other ground (b), it appears that plaintiff's wife was permitted to testify that plaintiff had expressed worry or concern over the education of his children, because of his blindness. Mental anguish was submitted as an element of damages. Defendant's theory apparently is that the proffered evidence tended to offset this evidence of mental distress, and that the subject of financial ability and resources had been opened up. A certain amount of discretion is allowed to the trial court in passing upon the relevancy of testimony; and, after all, relevancy is what is involved here. While the evidence had some bearing on plaintiff's financial ability and resources, it cannot well be claimed that it tended very strongly to relieve a reasonable person's anxiety about his children's education. We defer to the ruling of the trial court. We do not know what the evidence may be at another trial, but have felt impelled to make these general observations.

For the reasons stated, the judgment is reversed and the cause remanded for a new trial.

All concur except STORCKMAN, J., who dissents for reason that he does not believe plaintiff made a case for the jury.