Maize, Admr., Appellant, *v.* Atlantic Refining Company, Appellant.

Argued March 21, 1945. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON and JONES, JJ.

*John E. Evans, Jr.*, with him *Evans, Evans & Spinelli*, for plaintiff.

*J. Roy Dickie*, with him *H. A. Robinson* and *Dickie, Robinson & McCamey*, for defendant.

OPINION BY MR. CHIEF JUSTICE MAXEY, April 9, 1945:

This is a suit in trespass for damages for the wrongful death of Helen D. Maize, aged 33 years, the wife of Earl R. Maize, the administrator named as plaintiff. Mrs. Maize, the mother of two children, died as a result of inhaling the fumes of a poisonous chemical, carbon tetrachloride, which comprises 45% of a cleaning fluid designated as Atlantic Safety-Kleen which is manufactured and sold to the general public by the defendant. The cans which contain it, and from one of which Mrs. Maize procured the fluid, display on one side the words "A Highly Efficient Dry Cleaner" in letters 5/16" in height followed by these words in letters 3/16" in height:

"For every dry cleaning purpose. Will not injure the finest fabrics." On the can there twice appears the word "Caution" in letters $\frac{1}{4}''$ in height followed by the following words in $\frac{1}{8}''$ type: "Do not inhale fumes. Use only in well ventilated place." The compound word "SAFETY-KLEEN" appears on the two broad sides of the can in letters ranging from $\frac{1}{2}''$ in height to $\frac{3}{4}''$ in height, "S" and "K" being the largest letters, and on the two narrow sides of the can in letters a trifle smaller. Thus the compound word "SAFETY-KLEEN" stands out on the four sides of the can.

The 2-gallon can of Safety-Kleen which contained the fluid Mrs. Maize used was delivered to her by her brother on May 13, 1942, and on the following day she used the fluid in cleaning rugs in her home. One of these rooms was 18′ x 12′ in dimensions. The other was a smaller room. She worked at the job "a good part of one morning" and also in the afternoon and in the evening. At noon she had a headache from inhaling the fumes and in the evening she became ill. Her illness continued until May 27th when she died. It was established that the cause of her death was the inhaling of the fumes from Safety-Kleen. These fumes entered the blood stream and destroyed the liver and kidneys. Judge MARSHALL of the court below made the following statement in his opinion:

"Carbon tetrachloride fumes are so dangerous to human life that 1-7/10 cubic inches in a room containing 1000 cubic feet (1728 cubic inches equal 1 cubic foot) is the maximum amount to which a human can safely be exposed. The two-gallon can of "Safety-Kleen" placed on the market by defendant, when vaporized, contained 51,149 cubic inches of carbon tetrachloride fumes."

The issue submitted to the jury was whether or not the defendant had been negligent in giving an inadequate warning to the public of the dangers naturally resulting from the use of this cleaning fluid in places where the fumes would be confined as they were in the

rooms in which Mrs. Maize worked when she used this fluid. The jury returned a verdict of $2500 to Mrs. Maize's estate and $7500 to her husband and children. The defendant made a motion for judgment n. o. v. The defendant in support of its motion contended that the fluid used by Mrs. Maize was sold by it to Portable Lamp & Equipment Company for the latter's own use and not for resale, and that on May 13 or 14, 1943, Elmer Davis, a brother of Mrs. Maize (this brother being employed by Portable as a serviceman) took "out of stock" at Portable a can containing Safety-Kleen and delivered it to his sister. The defendant argues from this that Mrs. Maize stood in no legal relationship either to the defendant or to Portable. She simply used the fluid taken by her brother from the stock of Portable. As the court below pointed out, Elmer Davis testified that the can he took was a full can and he denied that he filled it from the drum on the original purchaser's premises. This presented an issue of fact for the jury on this phase of the case.

We do not deem this fact of vital importance, for this can of Safety-Kleen apparently came into Mrs. Maize's possession lawfully and she used it for the purpose it was manufactured and put on the market. We said in *Ebbert et al. v. Phila. Electric Co.*, 330 Pa. 257, 269, 198 A. 323: "The test to determine whether there is liability in an action of tort is in the answer to the question whether the defendant by an act or omission injured another by disregarding a duty imposed by law in respect to that other. Judge CARDOZO said in *MacPherson v. Buick Motor Co.*, 217 N. Y. 382, 111 N. E. 1050, 1053: 'We have put aside the notion that the duty to safeguard life and limb, when the consequences of negligence may be foreseen, grows out of contract and nothing else. We have put the source of the obligation where it ought to be. We have put its source in the law.'

"One duty imposed by law is to use due diligence to avoid causing harm which an individual has no legal

right to inflict upon another. This duty is breached by any legally harmful act or omission which might have been foreseen and avoided, . . . Holmes in 'The Common Law,' page 145, says: 'Most liabilities in tort . . . are founded on the infliction of harm which the defendant had a reasonable opportunity to avoid at the time of the acts or omissions which were its proximate cause.'

". . . In *Bisson v. Kelly*, 314 Pa. 99, 110, 170 A. 139, we said: 'The duty defendant breached was a duty imposed by law, not a duty self-imposed by contract.' "

That the fluid the defendant manufactured and sold for general use in cleaning fabrics is highly dangerous is proved by the tragic result in this case. That housewives and others would use the fluid in places that were not "well ventilated" by frequently changing currents of air might reasonably have been foreseen by the defendant. That the conspicuous display on each of the four sides of a can of the words "Safety-Kleen" would naturally lull the user of that fluid so-named into a false sense of security might also reasonably have been foreseen by the defendant. That the display at the very bottom of the two narrow sides of the can of the word "Caution" in ¼ inch letters followed by the words in ⅛ inch letters: "Do not inhale fumes; use only in well ventilated places", would be sufficient to cause every user of that fluid to use it in a place which would be sufficiently well ventilated to blow the fumes away before they were taken into the body by breathing may well be adjudged unreasonable. The word "SAFETY" was so conspicuously displayed on all four sides of this can of dangerous fluid as to make the word "Caution" and the admonition against inhaling fumes and as to use only in a well ventilated place seem of comparatively minor import. In fact, it is understandable that a woman busily engaged in the task of cleaning rugs might not take time to read everything on the can, particularly since the word "SAFETY" was so prominently featured as to exclude from her mind that "provident fear" which has been

characterized as "the mother of safety." This court has laid down the rule that anyone who is responsible for the existence of any dangerous instrumentality or substance with which persons are likely to come in contact must "impose a measure of control that is adequate to the protection of human beings" from it. See *MacDougall v. Penna. Power & Light Co.*, 311 Pa. 387, 166 A. 589, wherein we repeated at page 393 what was said in *Koelsch v. Phila. Co.*, 152 Pa. 355, 25 A. 522, in which latter case there were injuries resulting from the explosion of natural gas: "While no absolute standard of duty in dealing with such agencies can be prescribed, it is safe to say in general terms that every reasonable precaution suggested by experience and the known dangers of the subject ought to be taken."

We do not agree with the decision cited by defendant's counsel, in the case of *McClaren, Administratrix, v. G. S. Robins*, 349 Mo. 653, in which case a plaintiff suffered injuries from the use of carbon tetrachloride which his employer had purchased from the defendant in that case. There the Supreme Court of Missouri held that the plaintiff had not made out "a submissible case" because on the label were the words: "Volatile Solvent, use with adequate ventilation. Avoid prolonged breathing of vapor," and an agreed state of facts was that "other manufacturers of carbon tetrachloride use a similar label" and this label "was approved by the Surgeon General of the United States." "Other manufacturers" and the official just named are not authorized to prescribe the standards of care by which the respective rights and liabilities of persons subject to the jurisdiction of Pennsylvania courts are determined. We said in the *MacDougall* case above cited (pages 396, 397): "Vigilance must always be commensurate with danger. A high degree of danger always calls for a high degree of care. The care to be exercised in a particular case must always be proportionate to the seriousness of the consequences which are reasonably to be anticipated as a re-

sult of the conduct in question. Reason does not have to wait on usage; the latter must wait on reason. . . . Customary methods or conduct do not furnish a test which is conclusive or controlling on the question of negligence, or fix a standard by which negligence is to be gaged. . . . In *Cadillac Motor Car Co. v. Johnson,* 221 Fed. 801, it is stated: 'The common usage of the business is a test of negligence, but not a conclusive or controlling test.' In the case of *Zartner v. George,* 156 Wis. 131, 145 N. W. 971, the Supreme Court of Wisconsin aptly said: 'If the act in question is obviously dangerous, then evidence of custom is inadmissible, because custom cannot change the quality of an act. . . . Hence, when its quality clearly appears from the act itself, there is no need to invoke the aid of custom to determine it.' "

In the instant case it is clear that the court below could not declare as a matter of law that the defendant in displaying as it did the "cautionary" admonition on its can of Safety-Kleen discharged its full duty under the circumstances and was not guilty of negligence. It is equally clear that the court could not declare as a matter of law that Mrs. Maize's failure to heed the cautionary admonition displayed on the can, as above described, amounted to contributory negligence. The case was for the jury.

The court below while refusing to enter judgment for the defendant n. o. v. felt constrained to grant a new trial because of a mistake in receiving and recording the jury's verdict. Before the jury retired to deliberate, the judge wrote the words "Estate" and "Family" upon the verdict slip and instructed the jury to write thereon the amounts they found for respectively the estate and the family, if their verdict should be in favor of the plaintiff. The jury wrote after the word "Estate" $2500 and after the word "Family" $7500. These words were written above the word "Verdict" on the jury slip. Upon the trial judge receiving the verdict he wrote under the

word "Verdict" the following: "We find for plaintiff and award Earl R. Maize, Administrator of the Estate of Helen Davis Maize, deceased, the sum of $2500." And under that he wrote "We find a verdict for Earl R. Maize, Administrator of Helen Davis Maize, in her own right, for pain and suffering, the sum of $7500."

That the verdict as *thus* received and recorded was not what the jury intended is conceded by all parties in interest, and all the jurors have certified as follows: "We returned a verdict in favor of the plaintiff, and that we awarded damages to the husband, Earl R. Maize, and his two children in the sum of $7500, as written in our verdict slip after the word 'Family,' and that we returned a verdict in favor of the Estate of Helen Maize, deceased, in the sum of $2500. It was our intention to make these awards as above indicated, and it was our understanding that our verdict was recorded as thus written by us into the verdict sheet." The court en banc in its opinion says: "We are convinced that the trial judge made a mistake in writing out the verdict which was received and recorded in court . . ." The court then adds: ". . . we believe we have no authority to grant the plaintiff's petition to correct the verdict. . . . We, therefore, reluctantly grant a new trial; we say 'reluctantly' because of the mistake of the trial judge."

The change of a jury's verdict after it has been received and recorded is rarely asked for and even more rarely permitted. This court has said that the jury's "findings in court is what decides the rights of the parties": *Scott v. Scott,* 110 Pa. 387, 2 A. 531. This principle was recently reiterated in *Havranek v. Pittsburgh et al.,* 344 Pa. 375, 25 A. 2nd 703, where we said a new trial should not have been granted by the court below merely because one juror who had "agreed to the verdict" stated that when the verdict was received and recorded that she and three other jurors were "not satisfied" with it and it was "against their better convictions." In *Friedman v. Ralph Brothers, Inc.,* 314 Pa. 247, 171 A.

900, this court said: "The jury's verdict was orally announced in court without dissent from any juror. This action is final." In that case a new trial had been asked for on the ground that the foreman of the jury, after the verdict was sealed, refused to permit a juror to change her vote.

The cases just quoted from are the cases which the court below apparently believed precluded the granting of the petition for the correction of the admitted error in receiving and recording the jury's verdict. But in those cases the verdicts recorded were in fact the verdicts the juries *intended* to have returned and recorded. In the instant case the verdict received and recorded was not the verdict the jury had agreed upon. Through a clerical error on the part of the trial judge the verdict *recorded* was not the jury's real verdict. What the verdict in the jury's mind was and what it thought the verdict it was rendering was is not questioned by anyone. If under such circumstances a palpable mistake in the receiving and recording of a jury's verdict cannot be corrected by the court and the true verdict substituted therefor, justice must be sacrificed so that the recording of a jury's verdict may be invested with sacrosanct rigidity. Fortunately, the law does not require courts to apply any such unreasonable rule. In *East Broad Top Transit Co. v. Flood*, 326 Pa. 353, 357, 192 A. 401, this court said:

"Moreover, even after the reception of the verdict, appellant could have moved the court to mould or amend it so as to make it conform with the jury's apparent but unexpressed intention; this would have been a matter within the sound discretion of the court: *Shively v. McDonnell*, 308 Pa. 298, 301; *Nelson v. Philadelphia Rapid Transit Co.*, 314 Pa. 27; *Reppert v. White Star Lines, Inc.*, 323 Pa. 346, 351."

In *Cohn et al. v. Scheuer et al.*, 115 Pa. 178, 8 A. 421, where in an action of replevin a verdict was rendered "for plaintiffs" without assessing the damages, the verdict was amended several weeks afterwards by the courts

adding "for $461." This court upheld this action saying: "We must assume that there was evidence sufficient to satisfy the learned judge that the verdict was originally rendered for $461, and that the failure to so enter it was a mistake on the part of the crier. . . . The power of the Court of Common Pleas to amend its record so as to make it conform to what actually took place before it, has been so often and so emphatically asserted, that a reference to authority is almost unnecessary. As was said in *Trego v. Lewis*, 58 Penn., 463: 'Amendments which tend only to advance the interests of justice are not only proper, but necessary, and should always be allowed.'. . .

"The power of the court to mould or amend verdicts of juries is established by repeated decisions: *Iven's Appeal*, 33 Pa. St., 237; *Haycock v. Greup*, 57 Id. 438; *Byrne v. Grossman*, 65 Id. 310; *Smith v. Meldien*, 107 Id. 348. It was contended, however, that this power is confined to corrections made at the time the verdict is rendered. This is not the law. In *Iven's Appeal*, supra, the entry was 'May 27, 1857, verdict for plaintiff,' and on the 26th of October of the same year the record was amended so as to read 'verdict for the plaintiff on both issues.' And there seems no good reason why this should not be done. It would be intolerable if a verdict may be entered erroneously by the clerk, and the court be power-less on the next day to correct it. And, if it may do so on the next day, why not the next week, or the next month? What magic is there in the lapse of a few days or a few weeks to prevent the court from amending its own record to conform to the truth? Must the court be for-ever chained to an error merely because the sun has gone down upon it?"

In *Brown v. Commonwealth*, 78 Pa. 122, an amend-ment to the caption of an indictment for murder was permitted "after trial, conviction and sentence," this court declaring that by the amendment "no right or sub-stantial interest of the prisoner" had been infringed.

In *Zarko v. Kramer,* 117 Pa. Superior Ct. 443, 447, 177 A. 478, a verdict was returned in the Court of Common Pleas in favor of a plaintiff who had brought an action for damages in his own right and on behalf of his daughter, the minor plaintiff, who had been injured by the alleged negligence of defendants. The jury found a verdict "in favor of the plaintiff." On the argument of a motion by defendant to strike the judgment from the record, the parent plaintiff waived his right to the sum claimed by him for expenses. The court moulded the verdict so that it was in favor of the minor plaintiff by her father and next friend in the sum of $1833.25 which represented the difference between the verdict returned and recorded, $2000, and the sum claimed but later waived by the parent plaintiff. The Superior Court held that "this action was within the sound discretion of the court." It said "to hold that the court was without authority to mould the verdict would cause a grave injustice to the plaintiff."

In *Smullin v. Harenski,* 106 Pa. Superior Ct. 453, 162 A. 319, it was said: "Where the intention of the jury is plain, the court may mould the verdict into form according to the requirements of the law."

In *Minot et al. v. City of Boston,* 86 N. E. 783, the Supreme Judicial Court of Massachusetts said: "There is no doubt of the power of the court to amend a verdict after the discharge of the jury, and even after the end of the term at which the case was tried; . . . But there is one important limitation to this rule, and that limitation is that the amendment in all cases must be such as to make the verdict conform to the real intent of the jury. 'The judge cannot, under the guise of amending the verdict, invade the exclusive province of the jury or substitute his verdict for theirs.' *Acton v. Dooley,* 16 Mo. App. 441, 449. After the amendment the verdict must be not merely what the judge thinks it ought to have been, but what the jury intended it to be. Their actual intent, and not his notion of what they ought to

have intended, is the thing to be expressed and worked out by the amendment." *

To permit the verdict of a jury to be amended after the jury is discharged, except in a clear case of error in announcing and recording the verdict, might lead to great abuses, and such amendments are permissible only in very exceptional cases where the facts are not disputed and where justice requires it. This is such a case. This jury actually agreed on a verdict for the "Family" in the sum of $7500 and for the "Estate" in the sum of $2500, and so declared in its written return. The trial judge in amplifying the jury's finding confused in his composition the conceptions of "Estate" and "Family," and when his amplification was read to the jurors the latter not realizing that a transposition had been made in their respective findings gave formal assent to a verdict which they believed was the one they had agreed to and returned, but which was not. Since the facts are undisputed and no objection made by or in behalf of any party in interest, and since it is the just thing to do, the proposed amendment correcting what is so plainly an error will be ordered.

The judgment of the court below in refusing to enter judgment for the defendant n. o. v. is affirmed. The judgment of the court below in granting a new trial is reversed. The record is remitted to the court below with instructions to that court to enter judgment in favor of Earl R. Maize, Administrator of the Estate of Helen Davis Maize, deceased, for himself as surviving husband of Helen Davis Maize, and for the children of the deceased, in the sum of $7500, and to enter judgment in favor of Earl R. Maize, as Administrator of the Estate of Helen Davis Maize, in the sum of $2500.

---

* In *Prussel v. Knowles*, 4 How. (Miss.) 90, an amendment to the verdict was made after some but not all of the jurors had left the court room. The amendment limited the jury's finding against *all* of the defendants to some of the defendants. In *Sigal v. Miller* (Tex. Civ. App.), 25 S. W. 1012, an amendment to the verdict was made before all the members of the jury had left the court room, correcting a mistake in describing the premises involved.