Carlton E. ACHILLES and Olive Achilles,
Plaintiffs-Appellees,

v.

NEW ENGLAND TREE EXPERT CO.,
Defendant-Appellant.

No. 211, Docket 30724.

United States Court of Appeals
Second Circuit.

Argued Nov. 30, 1966.

Decided Dec. 7, 1966.

Clarence V. Akley, St. Johnsbury, Vt.
(Witters, Akley & Brown, St. Johnsbury,
Vt., on the brief), for plaintiffs-appel-
lees.

Richard H. Thomas, III, Burlington,
Vt. (Wick, Dinse & Allen, Burlington,
Vt., on the brief), for defendant-appel-
lant.

Before MEDINA, FRIENDLY and
SMITH, Circuit Judges.

MEDINA, Circuit Judge:

This is a case of rural justice in Ver-
mont. Farmer Achilles and his wife
Olive had expanded their little farm and
their herd of dairy cattle until there was
a fair prospect of reaching their ambi-
tion of a hundred head. Every day the
cows were driven to pasture past a water
hole where it was customary for them
to stop and slake their thirst. It was a
pretty spot, at the bottom of a gentle
slope; and the water hole was fed by a
small stream shaded by bushes and un-
derbrush on either side.

One day in October, 1960 a gang of
men employed by the New England Tree
Expert Company came with their equip-
ment to spray the stumps and underbrush
for the power company whose line passed
that way. When Farmer Achilles came
along the men had just about finished
the spraying. He saw drums and pails

lying about near the edge of the water hole and on the sprayer or some other part of the apparatus he read: "Warning—Keep Away From All Water Supplies." The men refused to give him any information about what they had been spraying and so he ordered them off.

It was immediately apparent that something had happened to the cows who drank at the water hole after the spraying. Two of them died. Many of the others became incapacitated in one way or another. Farmer Achilles tried every way he knew to find out about the spraying. His veterinarian told him he could furnish no antidote unless he knew what was in the spray that had found its way to the water hole. But the representatives of the Tree Expert Company were not communicative. After going to the State Police and other public authorities Farmer Achilles finally got a supervisor of the Tree Expert Company to meet him at the water hole to discuss the matter. All he could get out of the supervisor was that it was an "accident." When upbraided for the failure to give information, the supervisor replied that the company liked to hire people "who keep their mouth shut."

Soon after the spraying, scum formed on the surface of the water hole. Dead bees were found on the water; and the corpses of many dead denizens of the woods lay around the edge of the pool, including frogs "with their bellies up," toads, a chipmunk, a 'coon, a snake, and later a dog.

It developed at the trial that the gang of men from the Tree Expert Company had come in a truck and that the truck and the drums and pails and the spraying apparatus were used at the very edge of the water hole, so the men could get water. They mixed a certain amount of Weedone, a weed killer, with a certain amount of No. 2 Fuel Oil, and this mixture was placed in the sprayer and sprayed over the underbrush in the vicinity of the water hole, also on the bushes growing on either side of the stream leading to the pool.

By way of defense a number of expert witnesses testified that Weedone was absolutely harmless to man or beast, but the three or four men who actually did the mixing and spraying and who had refused to give any information to Farmer Achilles were not called to testify, nor were they even identified. It was not unlikely that it occurred to the minds of the jurors that men spraying underbrush may not always mix the ingredients according to orders, and that the pouring in and out of pails and drums right at the edge of the pool made it not improbable that some of the mixture and some of the raw ingredients found their way directly into the water. It seems to us to be just a bit silly to try to convince a jury of hardheaded Vermonters that it is perfectly all right to put a combination of chemical weed killer and No. 2 Fuel Oil into a farmer's water supply. In any event, we are now solemnly told that the case should not have been submitted to the jury but should have been dismissed, because Farmer Achilles did not have the water or the sad remains of little animals analyzed nor did he produce a veterinarian or other "expert" witness to testify to the cause of the death of two cows and the ill health of many of the others. But there are cases where common sense is more reliable than any amount of expert witnesses, and this is one of those cases. As there was no proof of any right to enter Farmer Achilles' land and do any spraying, the case was properly submitted to the jury in the double aspect of trespass and negligence. We do not see how, on the record in this case, the jury could have been reasonably expected to do otherwise than find in Farmer Achilles' favor for the highest amount warranted by the evidence.

The Tree Expert Company as appellant, however, insists that we must at least reverse and remand for a new trial because of what it characterizes as clear error in the instructions to the jury on the subject of damages. Farmer Achilles had prepared himself as well as he could for the ordeal of explaining how he cal-

culated his loss as a result of the spraying. He had some memoranda and slips of paper to which he referred. But the complexities of the law baffled him and so did the constant digressions. He was pretty clear in his testimony that the damage to his land was $5000 and that the two cows that died were worth $400 apiece. As the condition of the cows varied from year to year, as some improved and some grew worse as a result of the poisoning, it was not easy to make a precise showing of the number of cows sold for beef in 1961, 1962 and so on. There were others in bad shape that would still have to be disposed of. Farmer Achilles was sure the little brown cow that stayed home in the barn on the day of the poisoning was the best cow he had. As to the loss of milk production, this went up and down, it was on the whole 25%. The figures are bewildering. He testified that the loss on the sale of cows and the loss of milk production together amounted to $18,289. But other parts of his testimony would justify the conclusion that the loss on milk production alone was as high as $21,692.

The upshot was that, perhaps in a moment of absentmindedness, the trial judge instructed the jury that, in addition to damage for injury to the land, Farmer Achilles and his wife might be compensated for the loss of the two cows that died, for the loss on the sale of cows for beef and for the loss of milk production. Counsel for appellant immediately protested that this might result in a double or treble recovery. And in this counsel was clearly right. But the trial judge in effect replied that he did not think the jury would give Farmer Achilles any double or treble recovery, but if it did, he said: "I will take it away from him." This was indeed a novel and unorthodox procedure, and one which we cannot and do not approve, but it had some merit in the light of the peculiar circumstances of this case, as we shall see.

The jury returned a verdict for plaintiffs in the sum of $30,000, the full amount prayed in the complaint. Had the *ad damnum* clause been amended to ask for more the chances are the jury would have made the verdict as high as they could. The trial judge then ordered a remittitur in the amount of $6711 and the judgment appealed from was entered in the amount of $23,289 as Farmer Achilles accepted the remittitur. We have no doubt that the trial judge started with the $5000 for damage to the land, which is not disputed on this appeal because of the law of Vermont applicable to a trespass upon the land of another, and he then added a figure he thought would avoid any doubling or trebling of the recovery. In his brief memorandum, however, he described the figure $18,289 as representing the loss on milk production, whereas this is the exact figure given by Farmer Achilles as representing the loss on the sale of cows for beef together with the loss on milk production. At this stage of the case everyone seems to have forgotten about interest, although the trial judge instructed the jury that they might include interest. Perhaps they did.

What are we to do? There was an error in the instructions on the subject of damages and what appears to be another error in calculating the remittitur. But the fact is that a careful study of the entire record indicates a number of ways to justify the very amount used to fix the remittitur, without any double or triple recovery. Thus, call this particular Vermont judgment what one will, it does substantial justice and we will not disturb it.

Affirmed.