Clayton H. STIEF, Plaintiff-Appellant,

v.

J. A. SEXAUER MANUFACTURING CO.,
Inc., Defendant-Appellee.

Clayton H. STIEF, Plaintiff-Appellant,

v.

DIAMOND ALKALI COMPANY,
Defendant-Appellee.

Nos. 30/31, Dockets 30312, 30313.

United States Court of Appeals
Second Circuit.

Argued Sept. 28, 1966.

Decided April 7, 1967.

Certiorari Denied Oct. 16, 1967.
See 88 S.Ct. 220.

Seymour I. Toll, Cynwyd, Pa. (Charles A. Lord, Philadelphia, Pa., Norman J. Landau, New York City) (Richter, Lord & Cavanaugh, Philadelphia, Pa., of counsel), for plaintiff-appellant.

Benjamin H. Siff, New York City (Gair & Gair, New York City), for J. A. Sexauer Manufacturing Co., Inc.

J. Roger Carroll, New York City (Davis, Polk, Wardwell, Sunderland & Kiendl, New York City), for Diamond Alkali Co.

Before LUMBARD, Chief Judge, MOORE and FRIENDLY, Circuit Judges.

MOORE, Circuit Judge:

Plaintiff (appellant), Clayton H. Stief (Stief or plaintiff), a citizen of Pennsylvania, brought two actions in the District Court for the Southern District of New York to recover damages for personal injuries, one against defendant (appellee), J. A. Sexauer Manufacturing Co., Inc. (Sexauer), a New York corporation, and the other against appellee Diamond Alkali Company (Diamond), a Delaware corporation.

In substance, in the complaint against Sexauer, Stief alleged that, in the course of using a product, packaged and sold by Sexauer, known as "Mule Kick," and advertised as opening clogged drains, he was burned and permanently blinded by a spray containing Mule Kick which issued from a hole in a pipe which he was attempting to clear. Breach of warranty and negligence were charged. A second cause of action was based upon breach of express warranties of merchantability, safety, freedom from explosion, freedom from dangerous adulterants and of fitness for the particular purpose mentioned on the product as well as breach of implied warranties of safety.

In the complaint against Diamond, the manufacturer of the product, Stief also alleged negligence and breach of warranty.

The cases were consolidated and tried to a jury. During the trial, the breach of warranty issue was abandoned and the trial proceeded on the theory of negligence. At the close of plaintiff's case, defendants moved for direction of a verdict. The court granted the motion, dismissing the complaint as to Diamond, but reserved decision as to Sexauer. The motion for a direction was renewed at the end of the entire case, decision was

again reserved and the case was submitted to the jury on the morning of November 5, 1965. That evening the jury reported hopeless disagreement and was discharged.

Some five weeks later, the court, with the benefit of the full transcript of the record, additional memoranda, further oral argument and consideration of cited cases, granted the motion and dismissed the complaint against Sexauer. In a memorandum opinion, the court said: "Suffice it to state that, viewing the facts in a light most favorable to the plaintiff, this court is unable to formulate any reasonable view of them or of the law applicable to this case under which the defendant Sexauer might be held liable to this plaintiff, an experienced plumber who had used the product of the defendant on prior occasions, for this most unusual accident." What "the facts," so considered by the court in reaching this judgment, might have been are not disclosed because the court said: "No useful purpose would be served by a restatement of the facts here."

At the outset, this court must state its views as to the applicable principles of law against which the facts disclosed by the record must be reviewed.

First, the question for the trial court was: were there any facts, or facts from which inferences might be drawn, which should have been sent to the jury for its determination as to whether Sexauer had breached a duty to plaintiff. It was not for the trial court so to decide unless there was a failure by plaintiff to present any facts which met legal standards.

■ Second, plaintiff's previous experience as a plumber and his knowledge and use of Mule Kick was a relevant fact but certainly not decisive on the question of Sexauer's liability.

■ Third, the fact that the accident was "most unusual" is not to be considered in deciding whether the directed verdict was justified.

■ Quite apart from the reasons mentioned by the trial court, the function of this court on appellate review is to examine the entire record to determine whether there were any jury questions.

*The Issues on Appeal*

On appeal within the field of negligence, the issues have been narrowed further. Stief states "the plaintiff's case against Sexauer is grounded in the legally deficient characteristics of its 'Mule Kick' label" (Br. p. 6), and that "the essence of plaintiff's case of Sexauer's liability is directed toward that label's inadequacies, untruths, misstatements and misinformation" (Br. p. 2).

Stief's case, as stated in his appellate brief, "against Diamond is based on Diamond's role in checking Sexauer's label 'Mule Kick' from time to time and yet making no suggestion regarding the inadequate warning on that label when Diamond knew of the dangerous properties of the material which Sexauer was selling to an unwarned and unsuspecting public" (Br. p. 6).

Stief contends that "each of the following characteristics of the 'Mule Kick' label constitutes a legal deficiency which was proven," claiming that "each alone would raise a prima facie case of negligence against Sexauer." These claims are set forth verbatim (Br. pp. 6–7):

"a. The label describes 'Mule Kick' as safe. In truth it is extremely dangerous.

"b. The label failed to use the words 'Lye' or 'Caustic Soda.' This absence failed to warn the public of the dangerous material.

"c. The label stated that 'Mule Kick': 'Contains no disguised perfumes, ino DANGEROUS "bubbling" adulterants, causing injurious spray, explosive gases, harmful fumes.' In this respect it was misleading, for this product in combination with zinc did cause explosive gases which exploded, and its injurious spray blinded the plaintiff.

"d. The label failed to warn that explosive and propulsive gases might be created by reason of contact with pipe materials or for-

eign materials in drain stoppages. This was a breach of defendant Sexauer's obligation to warn of the hazardous propensities of its product. That breach directly resulted in the accident in suit.

"e. The label failed to warn users of 'Mule Kick' to employ goggles while in the presence of 'Mule Kick.' This was in violation of defendant Sexauer's duty to give users reasonable warning of reasonable precautions to be followed in using its product."

Stief takes the position that the statement of the Sexauer label, namely, "Contains no disguised perfumes, no DANGEROUS 'bubbling' adulterants, causing injurious spray, explosive gases, harmful fumes" is "the gist of the prima facie negligence against Sexauer" (Br. p. 20). The concession is made *arguendo* that "as the label stands it is not inaccurate," but it is claimed that "however accurate it may be, it is grossly, dangerously incomplete." Stief further limits Sexauer's alleged negligence to making a "grossly misleading" statement on the can "when it knew that the product under reasonably expected conditions would cause an 'injurious spray' and would cause a highly dangerous 'explosive gas.' " Stief asserts that he "proved that defendant knew or should have known of 'Mule Kick's' reasonably foreseeable hazardous propensities" (Br. p. 21).

*The Plaintiff's Case Against Sexauer*

The question of the correctness of the trial court's dismissal of the complaint must be tested by the proof adduced during plaintiff's case unless there were evidence developed by defendant Sexauer which might have supported plaintiff. For all practical purposes there were four witnesses, Stief, his fellow employee, Nixdorf, his expert witness, Dr. Willard, and one Springhorn, Assistant to Sexauer's President.

*Stief*

Stief, a plumber, an employee of the plumbing firm of Everts & Overdeer, Inc., in Lancaster, Pa., on January 25, 1961, was directed to proceed to 5 Locust Street, about a half-block from the office, to attempt to clear a clogged drain in a second-floor apartment occupied by tenants named Taylor. Nixdorf accompanied him. They discovered that the stoppage was in the kitchen sink. Their efforts with a plunger were unsuccessful. After draining the sink trap, they then poured down the drain one to two quarts of hot water which had been mixed with a can of Mule Kick, a caustic soda substance which they carried on their truck and had used for drain cleaning purposes on previous occasions. They prepared the solution in a galvanized pail and followed the instructions on the label which reads in its entirety as follows:

"MULE KICK"
Trade Mark Registered

Clears Clogged Drains—Peps up lazy drains.

Advertised in The Saturday Evening Post and a household favorite for a generation.

12 oz. net.

No odor—No fumes.

Waste Pipe Cleaner.

DIRECTIONS

To Clear Clogged Drains. 1st. Remove all water possible from drain. 2nd. Never pour cleaner in dry form directly into drain. 3rd. Dissolve one can in 1 quart boiling water in 3 gallon iron or enamel pail, Never Aluminum. Use double dose for obstinate stoppages. 4th. Caution: Pour contents of can into pail Slowly, stirring with stick. 5th. Pour solution slowly down drain. 6th. Give 8 hours to work. After solution drains away, flush with plenty of hot water.

Important: Prevent Clogs, Pep Up Slow Drains—keep clear and sanitary by using one-third can weekly. Keep cover on tight or "kick" will be lost.

"Mule Kick" is pure, powerful, safe. Contains no disguised perfumes, no Dangerous "bubbling" adulterants,

causing injurious spray, explosive gases, harmful fumes. "Mule Kick" will not dissolve broken glass or metal obstructions. It attacks the grease that catches coffee grounds, matches, hair, lint causing stoppages, and releases it. Follow directions closely. "Mule Kick" will destroy linoleum.

### For Health's Sake

Keep all drains clear and sanitary by using one-third can "Mule Kick" weekly. They are natural breeding places for Typhoid, influenza and other germs when slow running or clogged. A solution of one-third of a can has many uses about the house: 1st. Use weekly for ice-box, lavatory, sink, toilet, and bathtub drains to prevent clogs. 2nd. To clean and deodorize garbage cans. Swab with rag on stick; let stand half hour, then empty in sewers or cinders. Rinse and dry in sun. 3rd. To clean stove burners, cooking tops, burned cooking utensils (except aluminum) greasecaked tools and machine parts.

To thaw frozen pipes, mix 2 full-can solution as directed and pour into pipe.

Keep Away From Hands, face, clothing, linoleum, aluminum. See antidotes for external and internal caustic burns.

Poison

This Cleaner contains Sodium Hydroxide.

### Antidotes—Call Physician
External:

Flood with water, then wash with vinegar.

Internal:

Give vinegar, or juice of lemon, grapefruit, or orange, copiously.

Follow with olive oil.

Eyes:

Wash out with 5% boric acid solution.

### Container Made in U. S. A.

They then left. The next day, January 26th, Stief returned alone, found conditions unchanged, again drained the trap and poured another can of Mule Kick, prepared as previously, down the drain. This, also proving unsuccessful, Stief informed his office that it would be necessary to obtain permission to remove the flooring in order to expose the pipe line.

On the third day, January 27th, Stief removed floor boards in the second floor pantry, discovered a metal plug covering a clean-out opening in the pipe, removed the plug cautiously lest there be pressure, but found none and no seepage, although there was liquid in the pipe at that point. He then proceeded to the first floor and, removing the pantry flooring, noticed that the drain pipe from the second floor was joined to a sloping pipe under the pantry flooring by means of a 45° galvanized pipe elbow. Just below the elbow on the top of the sloping pipe was another plug-covered clean-out opening. He removed this plug, found no seepage or pressure, saw some flakes of ice above the hole not sufficient to cause a clogging of the drain, and concluded that the stoppage must be between the first and second floors. He replaced the plug, making it "finger tight." To eliminate any trouble from the ice flakes, Stief used a blow-torch in that area to heat that section of exposed pipe. He then returned to the office to obtain a "snake" —a device some twenty feet in length which can be twisted through clogging material in a pipe. This he inserted in the second floor opening. During this operation, there was no sign of pressure, of spraying, or of escaping gases, but also no sign of success in clearing the pipe. Not knowing what to do next, he returned to the first floor and while standing in the pantry doorway about eight feet from the exposed pipe trying to determine his next course, he heard a noise like a firecracker and was hit by a spray containing a sodium hydroxide solution which issued from the clean-out opening with sufficient force to cover the walls and ceiling of the pantry and to cover his face, eyes and upper body. Remedial measures failed and permanent blindness resulted.

### Nixdorf

Nixdorf's participation was limited to the use of the plunger and the pouring of the Mule Kick on the first day and to a description of the extent of the spraying observed by him when he returned shortly after the accident. He also participated in the removal of sections of the pipe at a subsequent date and installed a new line in the apartment.

### Dr. Willard

In November 1963, almost three years after the accident; Dr. Mary Willard was given for examination a section of the pipe containing the clean-out opening (from which the spray had issued) and the 45° galvanized elbow. She found at the end of the cut off piece of pipe at a point below (away from the second floor) the clean-out hole a hardened mass of material, which she assumed "was at some other point in the pipe before the accident." She made an analysis of a small sample and found that it contained 1.2% zinc. She also took scrapings from the interior of the galvanized elbow, found zinc present and stated as a chemical fact that zinc and sodium hydroxide will form hydrogen. Upon a factual hypothesis, including assumptions which plaintiff's counsel asserted would be "tied in," Dr. Willard gave her opinion as to cause, i. e., "metallic fragments which were in the pipe, the zinc, the zinc coming from the elbow, the iron, the aluminum fragments, reacted chemically with the sodium hydroxide to liberate hydrogen." She concluded that there were two causes of the accident, (1) the production of hydrogen, and (2) the heated solution of lye.

Dr. Willard also testified that her analysis of Mule Kick showed that it was "well fit for the purpose it was to be used" and that she found no zinc in Mule Kick. She had made no test as to the reaction of Mule Kick in galvanized pipe, new or old. It was her opinion that hydrogen would start evolving from zinc as soon as there was any sodium hydroxide present and that the gas would rise slowly. Her explanation for the gas, if any, not rising was the column of liquid above it, although there was no stoppage at the upper end of the pipe.

### Springhorn

This Sexauer employee also testified to the fact that zinc and Mule Kick produce hydrogen. He thought it was so stated on the can—actually the statement was made in the Sexauer catalog that Mule Kick was free of adulterants such as aluminum chips, zinc borings, or other agents which could cause harmful, obnoxious fumes, explosive gases or injurious sprays. (The label stated no "adulterants, causing injurious spray, explosive gases, harmful fumes.")

### The Applicable Law

Plaintiff relies upon five characteristics of the Mule Kick label which he claims "each standing alone would raise a prima facie case of negligence against Sexauer" (Br. p. 6).

a. "The label describes 'Mule Kick' as safe" whereas "In truth it is extremely dangerous."

The words on the label "pure, powerful, safe." cannot be isolated or read out of context. Stief had used Mule Kick many times before for its intended purpose—in fact, it was the only drain cleaner he used. He had read and re-read the label, which contained warnings that it was "Poison" and that it should be kept away from hands, face, linoleum and aluminum.

Since plaintiff bases his case on the alleged inadequacy of the label, the question immediately arises: what should have been put on the label which might have prevented this accident? No answer can be given to this question because the cause of the accident is completely unknown.

If there had been any testimony from which it could be inferred that it was reasonably foreseeable that contact of Mule Kick with zinc found in galvanized pipe would cause formation of explosive gases, plaintiff would be on firmer ground. But plaintiff was unable to

produce any evidence that would indicate that such a phenomenon as here occurred had ever happened during the generation Mule Kick had been on the market (some 3,800,000 cans sold), despite the fact that galvanized pipe is "probably the most common of all types of pipe" (Pl.Reply Br. p. 2).

■ Although the issue whether the likelihood of danger required a warning is normally a jury question, 2 Harper & James, Torts, p. 1546, the plaintiff must show something that should have led the defendant to action. The law requires a plaintiff, in order to establish a prima facie case of lack of warning, to show that the defendant knew, or through reasonable care should have known, of the possibility of the danger. See Dillard and Hart, Product Liability: Direction for Use and the Duty to Warn, 41 Va.L.Rev. 145, 156 (1955); Noel, Manufacturer's Negligence of Design or Directions for Use of a Product, 71 Yale L.J. 816, 830 (1962).

Plaintiff relies heavily on Maize v. Atlantic Refining Co., 352 Pa. 51, 41 A.2d 850, 160 A.L.R. 449 (1945); Spruill v. Boyle-Midway, Inc., 308 F.2d 79, 86 (4th Cir., 1962); Kieffer v. Blue Seal Chemical Co., 196 F.2d 614 (3d Cir., 1952); and Bean v. Ross Manufacturing Co., 344 S.W.2d 18 (Mo.1961).

In *Maize,* supra, "SAFETY-KLEEN" appeared in large letters on all four sides of the can. The only warning given was "Do not inhale fumes. Use only in well-ventilated places." The proof showed that the product contained thirty times as much carbon tetrachloride as could safely be inhaled in a room of 1,000 cubic feet. Under the circumstances, the court properly held that the question of whether the defendant had discharged its full duty to the purchaser was for the jury. However, there the defendant knew the strength of its product, the probable area of its intended use (the attention or, better, lack thereof) which would be given the label by the average housewife in using it, and the probable consequences of misuse.

In *Spruill,* supra, a baby had swallowed some of the defendant's product. The child died of chemical pneumonia. The legend "Poison" was in very small type but particularly determinative was the fact that the defendant had notice of 32 cases of chemical pneumonia (seven infants, four of whom died) during six preceding years. Even there, the court said that it was necessary for the plaintiff to show that "defendants knew, or should have known, that the product was being used, or might be used, in a dangerous manner * * *" (308 F.2d at 88).

In *Kieffer,* supra, an action against a drain cleaner manufacturer, the sodium hydroxide cleaner contained powdered metal aluminum (none in Mule Kick). The batch contained more aluminum than the formula called for which increased the vigor of its reaction. Furthermore, letters of complaint had been received by the defendant's President so that the defendant was on notice of the danger.

In *Bean,* supra, adulterants, aluminum and zinc chips (absent in Mule Kick), had been added to the powder without any warning of their reaction in water.

■■ The law as to alleged failure to warn cannot be better summarized than in the statement in the opinion in Jamieson v. Woodward & Lothrop, 101 U.S. App.D.C. 32, 247 F.2d 23, 25–26 (D.C. Cir.), cert. denied 355 U.S. 855, 78 S.Ct. 84, 2 L.Ed.2d 63 (1957):

"The cause of action in the case at bar does not arise from any of these. It arises, as we have said, from alleged negligence in failing to warn or otherwise protect the user in the use of the article.

"There are on the market vast numbers of products as to which the law holds the manufacturer to a duty to warn of foreseeable dangers or to provide safeguards against such dangers. But there are also on the market vast numbers of potentially dangerous products as to which the manufacturer owes no duty of warning or other protection. The law does not require

that an article be accident-proof or incapable of doing harm. It would be totally unreasonable to require that a manufacturer warn or protect against every injury which may ensue from mishap in the use of his product. Almost every physical object can be inherently dangerous or potentially dangerous in a sense. A lead pencil can stab a man to the heart or puncture his jugular vein, and due to that potentiality it is an 'inherently dangerous' object; but, if a person accidentally slips and falls on a pencilpoint in his pocket, the manufacturer of the pencil is not liable for the injury. He has no obligation to put a safety guard on a lead pencil or to issue a warning with its sale. A tack, a hammer, a pane of glass, a chair, a rug, a rubber band, and myriads of other objects are truly 'inherently dangerous', because they might slip. They cause accidents and injury even more often, we expect, than do rubber exercisers. But The doctrines fashioned by the law for inherently dangerous objects do not encompass these things. A hammer is not of defective design because it may hurt the user if it slips. A manufacturer cannot manufacture a knife that will not cut or a hammer that will not mash a thumb or a stove that will not burn a finger. The law does not require him to warn of such common dangers. On the other end of the spectrum of practicalities, a manufacturer should not be permitted to market without protection to the user a spray which would kill trees if used at the wrong time, as in *McClanahan*,[1] or a skirt which would otherwise ignite if brushed by a lighted cigarette, as in *Noone*.[2] A manufacturer might be liable for failure to provide a shield or an emphatic warning to users of an electric power saw, but he would not be liable if he failed so to provide in respect to a kitchen knife."

b. *The Failure to Use the Words "Lye" or "Caustic Soda" instead of "Sodium Hydroxide."*

Stief knew that Mule Kick had to be handled with care. The label advised him of the precautions which he should take. His testimony disclosed that he took them. The use of the word "lye" would not have added to his knowledge of its characteristics.

c. *The Label's Statements as to no Adulterants.*

The testimony of plaintiff's expert established this to be a true statement. It contained no zinc or the listed adulterants.

d. *The Failure of the Label to Warn that Explosive and Propulsive Gases might be created by reason of contact with pipe materials or foreign materials in drain stoppages or by the use of heat.*

This argument defies and rejects the reasonably foreseeable principle of law. Were plaintiff's contention to be adopted, the seller of every drain cleaner would have to advise the purchaser that, before using, he should clean out the clogged drain, that the clogging material must first be removed and that a sample should be tested to ascertain whether it would be safe to use the drain cleaning substance. Or the clogged pipe would have to be removed and sections or scrapings thereof be tested for possible explosive reactions to Mule Kick. But according to Stief and his fellow employee, Nixdorf, in all their years of experience with Mule Kick in all kinds of pipes they had not experienced any explosive or propulsive reaction of the liquid in any pipe.

Nor is there any basis for speculation that plaintiff's use of the blow-torch to

---

1. [Court's footnote renumbered] McClanahan v. California Spray-Chemical Corp., 194 Va. 842, 75 S.E.2d 712 (1953).

2. [Court's footnote renumbered] Noone v. Fred Perlberg, Inc., 268 App.Div. 149, 49 N.Y.S.2d 460 (1944), aff'd 294 N.Y. 680, 60 N.E.2d 839 (1945). Cf. Frank R. Jelleff, Inc. v. Braden, 98 U.S.App.D.C. 180, 233 F.2d 671, 63 A.L.R.2d 400 (1956).

melt the observed ice crystals produced a hydrogen explosion. If heat had any gas-forming effect, the explosion, if such it were, should have occurred when the heat was applied. The proof is uncontradicted that it did not. To the contrary, an appreciable amount of time elapsed thereafter while Stief went to his office to obtain the plumber's snake, returned to the second floor Taylor apartment, used the snake unsuccessfully, and then proceeded to the first floor to consider his next move. Furthermore, there is no claim made by Stief in his enumeration of "legal deficiency" in the label (a-e, supra) that a warning as to heat had been negligently omitted or was even required.

As to the timing of the formation of hydrogen gas, it was the opinion of plaintiff's expert that contact between Mule Kick and zinc would create hydrogen immediately, whereas the proof was that the Mule Kick was poured in first on the 25th, again on the 26th with no tangible signs of pressure or gas formation, and that the propelled spray accident did not occur until the 27th. Furthermore, gas if formed by the liquid Mule Kick according to the testimony of Dr. Willard, would rise, being fourteen times lighter than air. Thus, as to the adequacy of the Sexauer label, there was no proof from which the jury could have concluded that Sexauer had notice of any chemical fact or of any experience involving the use of Mule Kick which should have caused it to warn against its use if galvanized pipes might be encountered or against the use of external heat on pipes containing Mule Kick.

e. *The Failure of the Label to Warn that Goggles should be worn.*

At the time of the accident, Stief was actually not working with Mule Kick and had no need to wear goggles. He had just returned from the second floor and was standing at the pantry door on the first floor wondering what to do next. Any warning on the label about wearing goggles when using Mule Kick would not have been applicable at the time.

Plaintiff here presents the same argument as was made in the *Jamieson* case, supra, namely, that the case should have been submitted to the jury. Again turning to *Jamieson* for a clear analysis of this argument, we agree with the answer thereto, in the court's statement (247 F.2d at 33):

"It is urged that a contest of the sort here involved can just as well be submitted to a jury, without a prior determination of possible liability on the part of the defendant. There is in some sociological circles a philosophy that the burden of damages suffered in accidents with manufactured articles ought to be widely spread, by way of the manufacturer and his available insurance, such as is the plan widely adopted in respect to injuries suffered in employment.[3] But such a plan ought to be adopted, if it is to be adopted, by the voice of the people generally, expressed by the legislative branch of the government. It ought not be imposed by the judicial branch. To be sure, there are many respects in which the development of the common law calls for re-examination and change by the courts. The advances made by the courts in this very field by cases such as *Huset*[4] and *MacPherson* [v. Buick Motor Co., 217 N.Y. 382, 111 N.E. 1050, L.R.A.1916F, 696] supra, are illustrations. But so sweeping a change in commercial liability as the change just mentioned is not within that area. We must, when appropriate procedural demands have been

---

3. [Court's footnote renumbered] The subject is discussed in an article by Dean Pound, New Theories of Liability, 8 N.Y. Co. L.A.B.Bull. 32, 35 (1950).
　See also James, Functions of Judge and Jury in Negligence Cases, 58 L.J. 667, 689 (1949).

4. [Court's footnote renumbered] Huset v. J. I. Case Threshing Mach. Co., 120 F. 865 (8th Cir. 1903).

made, determine at the outset of an action whether a possible liability in law of the defendant has been indicated by the plaintiff. This is a concept basic in our jurisprudence. It is established, firmly and correctly, that if a defendant has violated no legal obligation, his liability for pecuniary damages must not be submitted to the possible prejudices, sympathies or whims of a lay jury. His basic liability is first to be tested as a matter of law by the judge."

■ ■ And, as recently stated in Borowicz v. Chicago Mastic Company, 367 F.2d 751, 760 (7 Cir., 1966): "the premise of pecuniary liability for tort is not the mere fact of injury, but injury plus fault. It would be totally unreasonable to require that a manufacturer warn or protect against every injury which may ensue from a mishap in the use of his product."

*The Case against Diamond*

■ The gist of Stief's argument is that, assuming that Diamond knew the nature of Sexauer's Mule Kick label, Diamond should have insisted upon, or exterted some power or pressure upon Sexauer to provide, a label which would have avoided this accident. However, as in the case of the Sexauer label, since the cause of the accident is unknown, what could Diamond have suggested be added to the label even assuming such a policing power?

Since on the facts here presented, there would have been no rational basis for a jury's conclusion that the accident was caused by an inadequate label, the trial court correctly dismissed the case against Diamond.

Judgment dismissing the complaint against Sexauer and Diamond affirmed. No costs.

FRIENDLY, Circuit Judge (dissenting as to Sexauer and concurring as to Diamond):

I believe the majority's affirmance of the dismissal of the complaint with respect to defendant Sexauer unwarrant- ably deprives the plaintiff of his right to a jury trial.

To have his case against Sexauer submitted to a jury, Stief was merely required to present evidence sufficient to warrant a finding that his serious injury was caused by a property of Mule Kick of which Sexauer knew or ought to have known and against which it should have warned. The majority opinion, as I understand it, rests on the basis that he did not present sufficient evidence to show what the cause of the accident was and that it would therefore have been impossible for Sexauer to have prepared a warning that would have prevented the catastrophe. This view rests on too formalistic an approach to the evidence, particularly in the light of the established rule that in determining whether evidence is sufficient to take a case to a jury, all reasonable inferences must be drawn in plaintiff's favor.

On the issue of causation we start with three undisputed facts: At temperatures of 125° Fahrenheit and above a combination of sodium hydroxide and zinc will generate hydrogen gas; there was zinc in the galvanized elbow of the pipe as well as in the clogged material; and, when the liquid escaped from the pipe, there was an explosion the propulsive force of which carried the liquid to the ceiling of the pantry and to a wall eight feet away. These facts alone might suffice to warrant a finding that the generation of hydrogen gas from the reaction of sodium hydroxide with zinc at a high temperature caused the accident. Since the only alternative explanation offered by Sexauer, of a free fall of liquid caused by the melting of the ice, failed to account for the wide spread of the liquid through the pantry, the jury would have been justified in accepting plaintiff's theory. As Judge Medina has recently said, "But there are cases where common sense is more reliable than any amount of expert witnesses, and this is one of those cases." Achilles v. New England Tree Expert Co., 369 F.2d 72, 73 (2 Cir. 1966).

However, the proof went considerably beyond this. Dr. Mary Willard, Professor Emeritus of Chemistry at Pennsylvania State University, testified that in her opinion the accident was caused by the production of hydrogen from the combination of zinc with the heated solution of sodium hydroxide. She thought that the production of hydrogen above the stoppage forced the stoppage down through the pipe past the clean-out hole and that this pressure expelled the plug and the caustic solution through the hole. Another theory, consistent with a statement by Stief in applying for workmen's compensation benefits although in conflict with his trial testimony, is that there were two stoppages, one of ice above the plug and another of grease and debris below; that the melting of the ice by the torch caused some of the Mule Kick solution to fall through the pipe past the clean-out hole where it was stopped by the second blockage; and that the reaction of the Mule Kick with zinc in the pipe at the high temperature created by the torch produced hydrogen, which expelled the plug and caused the mixture to spurt through the hole. When Sexauer challenged these theories by asserting that if hydrogen had been formed, it would have bubbled up and been seen by Stief when he ascended to the second floor and put the snake down the pipe, Dr. Willard responded that the gas would have been held down by the long column of liquid in the pipe. Whether this was implausible, as Sexauer claims, is precisely the kind of question that ought to be left for decision by a jury unless the implausibility is such that no rational mind could think otherwise. That was not the situation either as to the matter of bubbling or as to the other element stressed by the majority, the time between Stief's application of the torch to the pipe and the explosion. I see no reason why, in the absence of contrary scientific evidence, the jury could not conclude that the application of the torch might have begun the hydrogen-forming reaction, and that this would have had to continue for five or ten minutes—the time it took Stief to get the snake, place it in the pipe on the second floor, and walk downstairs to the pantry—before enough hydrogen to cause the explosion could have been formed. Not only was there no such evidence, but defendant's expert testified that at 125° F. zinc would react with sodium hydroxide only "very slowly." If twelve practical people can be persuaded that Stief's theory of the accident was more plausible than Sexauer's, I fail to understand how a judge could say they had gone beyond the bounds of reason.

Once this is admitted, the plaintiff was entitled to a jury's consideration whether the label was adequate in view of the hazard of the formation of hydrogen as a result of contact with zinc at a high temperature. Sexauer knew that sodium hydroxide involved this hazard, and it is common knowledge both that household plumbing frequently contains galvanized pipe and that galvanized pipe is coated with zinc. Under these circumstances a jury could rationally find that failure to warn of the hazard of utilizing Mule Kick in conjunction with galvanized pipe at a high temperature was negligent; indeed, defendant's witness Springhorn, formerly sales manager and at the time of trial assistant to the president of Sexauer, thought the label in fact contained a warning with respect to zinc, as it did with respect to aluminum. Moreover, the label was not merely deficient in warning against the application of heat, but worse than that; it instructed the user to dissolve Mule Kick in "boiling water" and to "flush with plenty of hot water," and urged that it be used to thaw frozen pipes. Thus, there was not merely a lack of warning with respect to the dangers of contact between a heated solution containing Mule Kick and zinc but a positive indication of lack of danger from heating.

The majority argues against this that there is no evidence of previous experience of Mule Kick having generated sufficient hydrogen gas through contact with galvanized pipes to cause an explo-

sion. Of course, the absence of any evidence to this effect does not mean that no such incident had ever occurred. In any event the jury could find that since the hazard was known, Sexauer was under a duty to warn against it and certainly under a duty not to say things that would invite it. While the majority opinion cites many cases from other courts, it unaccountably neglects to refer to our own decision in Butler v. L. Sonneborn Sons, Inc., 296 F.2d 623, 626 (2 Cir. 1961), which is about as close in point as one tort case can be to another. There also a manufacturer contended that a long record of accident-free experience justified failure to give a warning. We rejected that contention, saying:

> "But, especially when injury is likely to be serious if trouble occurs, even slight foreseeability may warrant, and a long history of good fortune will not necessarily exclude, a conclusion by the trier of the facts that prudence requires the manufacturer to take on so small an added burden."

Depriving Stief of jury determination of the common sense questions on which his case against Sexauer depends runs wholly counter to the trend of Supreme Court decisions over the past decades.

I concur in the affirmance as to Diamond although not on the ground relied on by the majority. The 400 pound drum in which Diamond sold caustic soda to commercial and industrial buyers for a variety of uses bore a label reprinted in the margin.* Stief's contention is not that this label was inadequate in the sense that it did not inform Sexauer of the danger that contact with zinc might result in the formation of hydrogen; since Sexauer knew all about this, any such deficiency in the label would have lacked sufficient causal relation to the accident. The claim is rather that Diamond was bound to see to it that Sexauer's label was adequate. Plaintiff relies heavily on Restatement (Second), Torts § 388 (1965) and particularly on the discussion of "Warnings given to third person" at pp. 307–10.

Most of the discussion, however, does not read directly on the instant situation where a manufacturer sells a raw material in large containers to many purchasers for a wide variety of uses and the particular purchaser has repacked it under his own name and label. Perhaps the only observations directly applicable are the scarcely decisive ones that "it is obviously impossible to state in advance any set of rules which will automatically determine in all cases whether one supplying a chattel for the use of others through a third person has satisfied his duty to those who are to use the chattel by informing the third person of the dangerous character of the chattel, or of the precautions which must be exercised in using it in order to make its use safe," and that "modern life would be intolerable unless one were permitted to rely to a certain extent on others' doing what they normally do, particularly if it is their duty to do so." I am far from saying that circumstances could never arise in which a manufacturer like Diamond might be subjected to liability for inadequate labelling by an intermediary like Sexauer, as, for example, if it knew a packager who had purchased significant quantities of its caustic soda was putting this into the market with no warning whatever, or if the packager had submitted and obtained approval for a label that was highly misleading. But the facts here are at the opposite end of the spectrum from these hypotheticals.

Sexauer had been selling Mule Kick for thirty years under the same label but began purchasing caustic soda from

---

* "WARNING: CONTAINS CAUSTIC SODA. Burns skin and eyes. Avoid contact with body or clothing. Do not take internally. When handling wear goggles or face-shield and avoid all skin contact. While making solutions, add Caustic Soda slowly to surface to avoid violent spattering. In case of accidental skin contact, flush affected parts with water and wash with vinegar. For eyes, flush freely with water for at least 15 minutes. Obtain medical attention."

Diamond only a little while before the injury to Stief. The record reveals nothing as to how important an outlet Sexauer then became, and there is no evidence that Diamond had seen its catalog or periodical advertising. Although plaintiff claims there is evidence that Diamond had seen the label on the can, the testimony was highly equivocal and surely does not show that Diamond had seen the label before it sold the caustic soda that was repackaged into the cans used by Stief in January, 1961, or that if it had protested upon seeing the label, the accident would have been avoided. Moreover, although a jury could find the Sexauer label inadequate to discharge the duty of care of a distributor to the plumbing trade, it was not blatantly offensive or insufficient; the degree of foreseeability of danger and hence the amount of care required with respect to warning may vary somewhat inversely with a seller's distance from the specific use and with the number of intermediaries. On the facts here presented, there would have been no rational basis for a jury's concluding that Diamond had failed to exercise reasonable care with respect to the plaintiff.